Stephen P. LASSER, Plaintiff,

v.

**RELIANCE STANDARD LIFE INSURANCE COMPANY,**
Defendant.

Civil Action No. 99–4131.

United States District Court,
D. New Jersey.

June 13, 2001.

Lewis Stein, David J. Gruber, Nusbaum, Stein, Goldstein & Bronstein, Succasunna, NJ, for plaintiff.

Joshua Bachrach, Rawle & Henderson, Marlton, NJ, for defendant.

WOLIN, District Judge.

## OPINION

This matter was opened before the Court upon the complaint of plaintiff Dr. Stephen P. Lasser against defendant Reliance Standard Life Insurance Company ("Reliance") claiming that plaintiff was wrongly denied disability benefits under an insurance policy maintained by his employer. Jurisdiction is established by the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. § 1132. This Court denied summary judgment and made certain other rulings governing the litigation of this matter in an Opinion and Order reported as *Lasser v. Reliance Standard Life Ins. Co.*, 130 F.Supp.2d 616 (D.N.J., Feb.8, 2001) (the "February Opinion").

This matter was tried to the Court on April 10, 2001. At trial, the Court heard live testimony relevant to those issues delineated in the February Opinion and certain other issues as discussed below. In addition, the Court has considered the administrative record before the claims adjudicator who denied Dr. Lasser's claim for benefits on behalf of Reliance. This Opinion constitutes the Court's findings of fact and conclusions of law, pursuant to Federal Rule of Civil Procedure 52. For the reasons set forth below, the Court will reverse the denial of benefits by Reliance and enter judgment in favor of plaintiff.

## BACKGROUND

The background of this matter was set forth at length in the Court's February Opinion, familiarity with which is assumed. Pursuant to its policy of insurance, Reliance acts as the insurer/underwriter and claims administrator of the ERISA-governed, employee benefit plan maintained during periods relevant to this matter by Townsquare Orthopedic Associates. Dr. Lasser was an orthopedic surgeon employed by Townsquare Orthopedic, a small, four-doctor practice.

Dr. Lasser has had a heart condition for many years. He has undergone bypass surgery and suffered a myocardial infarction, referred to in this Opinion by the more colloquial "heart attack." The decision to deny Dr. Lasser's application for disability benefits was made by Richard Walsh, Esq., Reliance's Manager of Technical Services. The evidentiary record in this matter consists of written materials used by Mr. Walsh in making his decision and Mr. Walsh's testimony at trial.

As this Court explored at length in its February Opinion, this case presents two discrete fields of inquiry. First, under the Third Circuit's decision in *Pinto v. Reliance Standard Ins. Co.*, 214 F.3d 377 (3d Cir.2000), this Court must decide whether the insurer's decision to deny benefits was tainted by a conflict of interest. Deciding this question is necessary to determine where on *Pinto*'s "sliding scale" of arbitrary and capricious review this case belongs; the greater the evidence of conflict, the less this Court may defer to the insurer's determination. Second, once the correct standard of review has been determined, the Court must apply it to the claims administrator's decision and decide whether, on the record before him, the

administrator was arbitrary or capricious in denying the benefits.

Because of the nature of this action, not all evidence may be considered on all issues. Any evidence properly before the Court may be considered to decide whether Reliance was influenced by a conflict of interest. When it comes to determining whether the denial of benefits was or was not arbitrary and capricious, however, the inquiry must be limited to that evidence before the claims administrator. *See generally Lasser*, 130 F.Supp.2d at 627–30. The only witness to testify at trial of this matter was Mr. Walsh. Much of his testimony was relevant solely to the conflict-of-interest question and extrinsic to his denial of Dr. Lasser's benefits. Other testimony, however, concerned the extent of Walsh's knowledge when he made the benefits determination and the various internal rules and conventions under which he operated.

Walsh's understanding and these rules and conventions, while not part of the paper record, nonetheless form part of the matrix within which Walsh made the decision affecting Dr. Lasser. Their soundness, *vel non*, provides important insight into whether and how Walsh may have abused his discretion. Evidence of what Walsh considered and how he considered it is thus part of the "record" in the broader sense. Moreover, Walsh's testimony regarding the basis for the denial of benefits substantially mirrors the arguments of Reliance's counsel, as might be expected given that Walsh is himself an attorney. On this basis, the Court will consider certain of Walsh's trial testimony in relation to the underlying question of whether the denial of benefits was arbitrary and capricious. The Court has been careful, however, to treat only the actual evidentiary record before the claims administrator as dispositive of the ultimate question of whether denial of the benefits was an abuse of discretion under the policy.

## DISCUSSION

### 1. Determining the Standard of Review

As noted above and as explored extensively elsewhere, *Pinto v. Reliance Insurance* held that where an insurer of an ERISA plan is also acting as a claims administrator a structural conflict of interest [1] exists between the company's duty to administer claims fairly and its obligation to pay those claims from its own coffers. It is established in this case that the Townsquare Orthopedic Associates ERISA plan granted discretion to Reliance to administer benefits. The United States Supreme Court has held that when an ERISA plan grants such discretion to a fiduciary, a denial of benefits may be reviewed in the federal courts only for abuse of that discretion, or under the functionally equivalent arbitrary and capricious standard of review. *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989).

■ The Court recites the well-known law articulating this standard because it provides a base of reference for what follows. Under the arbitrary and capricious standard, "the district court may overturn a decision of the Plan administrator only if it is 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *Abnathya v. Hoffmann–La Roche, Inc.*, 2 F.3d 40, 45 (3d Cir.1993) (quoting *Adamo v. Anchor Hocking Corp.*, 720 F.Supp. 491, 500 (W.D.Pa.1989)); ac-

1. This conflict has also been referred to by this Court and the Court of Appeals as the "inherent conflict" or "structural bias" problem. *E.g.*, 214 F.3d at 389. Although "structural conflict" is perhaps the most descriptive, the Court will continue its prior practice of using these terms interchangeably.

*cord Mitchell v. Eastman Kodak Co.,* 113 F.3d 433, 439 (3d Cir.1997). "A decision is supported by 'substantial evidence if there is sufficient evidence for a reasonable person to agree with the decision.'" *Courson v. Bert Bell NFL Player Retirement Plan,* 214 F.3d 136, 142 (3d Cir.2000); *Daniels v. Anchor Hocking Corp.,* 758 F.Supp. 326, 331 (W.D.Pa.1991). Thus, the scope of review is narrow and "'the court is not free to substitute its own judgment for that of the [administrator] in determining eligibility for plan benefits.'" *Id.* (quoting *Lucash v. Strick Corp.,* 602 F.Supp. 430, 434 (E.D.Pa.1984), *aff'd,* 760 F.2d 259 (3d Cir.1985)).

■ The *Pinto* Court held that "when an insurance company both funds and administers benefits, it is generally acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review." 214 F.3d at 378. The Court of Appeals left to consideration of the individual case exactly how "heightened" the form of arbitrary and capricious review must be. The lower courts must consider factors suggesting self-interest on the part of the claims administrator. These factors will guide the courts' selection of the appropriate point along the "sliding scale" of more and more intrusive scrutiny of administrators' decision. *Id.* at 379.

The Court of Appeals acknowledged that it was giving birth to "some form of intermediate scrutiny that has no analogue in this field," 214 F.3d at 392, and questions remain regarding its application. One is whether a threshold increase in the level of scrutiny is required in all cases in which a claims administrator operates under an inherent conflict of interest, or whether *Pinto*'s sliding scale might, in the appropriate case, slide all the way back to fully deferential arbitrary and capricious review. The Court does not refer to those cases in which an insurer's structural conflict problem is directly ameliorated by considerations such as an experience-rated premium relationship with its insured. *See* 214 F.3d at 388 n. 6. The question is, where does the "sliding scale" start in the archetypal case of an insurer/claims administrator for which every granted claim travels, dollar-for-dollar, to the company's bottom line.

The Eastern District of Pennsylvania has found that *Pinto* requires heightened arbitrary and capricious review in all cases where an inherent conflict is present. *Cimino v. Reliance Standard Life Ins. Co.,* 2001 WL 253791, *3 (E.D.Pa., March 12, 2001). References in post-*Pinto* Court of Appeals decisions support that view. *Goldstein v. Johnson & Johnson,* 251 F.3d 433, 441 (3d Cir.2001) (heightened arbitrary and capricious review properly applied where design of plan creates conflict of interest *or* where specific facts exist indicating bias); *Orvosh v. Program of Group Ins. for Salaried Employees of Volkswagen of Am., Inc.,* 222 F.3d 123, 129 n. 7 (3d Cir.2000) (in *Pinto,* "we decided that a heightened standard of review applies where the same entity both funds and administers an ERISA plan"). In *Oslowski v. Life Ins. Co. of No. Am.,* 139 F.Supp.2d 668 (W.D.Pa.2001), the district court found that in the absence of extrinsic evidence of conflict or bias, an administrator in a structural conflict situation was entitled to a "moderate degree of deference."

Passages from *Pinto* itself may be read to suggest that some increase in scrutiny is mandated in all cases of inherent conflict. Indeed, the Court of Appeals stated bluntly, "we believe that a higher standard of review is required when reviewing benefits denials of insurance companies paying ERISA benefits out of their own funds." 214 F.3d at 390; *see also id.* at 378 ("[W]e

hold that, when an insurance company both funds and administers benefits, it is *generally* acting under a conflict that warrants a heightened form of the arbitrary and capricious standard of review.") (emphasis added). The introduction of the sliding scale concept later in the *Pinto* opinion complicates the simplicity of these pronouncements. Moreover, this Court recognizes, as did the *Pinto* court, the esoteric nature of the entire sliding-scale approach. *See id.* at 392–93. These caveats notwithstanding, the Court believes that traditional, unmodified arbitrary and capricious review can no longer be appropriate in the paradigm case of an insurer with a true, structural conflict, even where other indicia of conflict or bias are absent.

This being said, it is also clear that the beginning point of *Pinto* 's sliding scale of heightened arbitrary and capricious review lies but a modest distance from the original standard, and that, absent other evidence of bias, the Court should engage in no more than a modicum of additional scrutiny. In February, this Court wrote:

> Thus, at trial, the Court will consider all the evidence relevant to the degree of conflict and the resulting location on *Pinto* 's range of heightened arbitrary and capricious review, and the Court will render a plenary determination of those issues at that time. At this stage of the proceeding, the level of intrusiveness with which the Court will review the denial of benefits is still an open question. The facts that emerge may confirm the Court's view as already expressed. These facts may, however, move the Court either further along the scale towards *Pinto* 's "high degree of scepticism" or, assuming the problems already identified are satisfactorily explained, back towards a more deferential standard of review.

130 F.Supp.2d at 626. The Court, it is true, did posit a standard of review it considered appropriate based on the facts then before it. The Court was careful, however, as the quoted passage shows, to make clear that this standard of review was a tentative one.

The foregoing discussion was necessary for the following reason. Based upon the trial testimony in this matter, the Court finds no evidence of overt bias exhibited by Walsh, the claims administrator. It will be seen below that the Court finds that the denial of benefits was erroneous, and, indeed, so wrong as to require reversal under any standard. It would be redundant to repeat each of these errors here only to discuss them again later in connection with the merits. Suffice it to say that Walsh's testimony has convinced the Court that the specific shortcomings identified in this Court's February Opinion were due to errors of analysis and not bias in favor of his employer. The instances raised by counsel leave Dr. Lasser's allegations of active self-dealing not proven.

As discussed, this leaves the Court at the mild end of the heightened arbitrary and capricious scale, subjecting the benefits decision to only that extra scrutiny required by the structural conflict arising from the insurer acting as its own claims administrator. For lack of a more precise formulation, the Court adopts that of the Western District of Pennsylvania and finds that a "moderate degree of deference" is the proper standard of review.

**2. The Merits of the Decision**

■ Each of the issues in play in this case is governed by the Reliance policy. It provides that:

> "Totally Disabled" and "Total Disability" mean, with respect to [Physicians and Administrators], that as a result of an

injury or Sickness,[2] during the Elimination Period and thereafter an insured cannot perform the material duties of his/her regular occupation;

(1) "Partially Disabled" and "Partial Disability" mean that as a result of injury or Sickness an insured is capable of performing the material duties of his/her regular occupation on a part-time basis or some of the material duties on a full-time basis. An insured who is Partially Disabled with be considered Totally Disabled, except during the Elimination Period;

. . . .

This is an occupational disability policy, which insures against loss of income due to the inability of insureds to engage in their regular or usual occupations. It is to be distinguished from a general disability policy, which provides benefits only to insureds who cannot engage in *any* occupation for which they are reasonably suited. *Smith v. Equitable Life Assur. Soc. of the United States,* 67 F.3d 611, 616 (7th Cir. 1995).

Within the question of the substantive merits of the administrator's decision again lie two, discrete areas of inquiry. First, the parties dispute what activities Dr. Lasser can or cannot do. Second, the parties dispute what activities constitute the "material duties of [Dr. Lasser's] regular occupation." Again, familiarity with many of the details of the record evidence on these points, discussed at some length in the February Opinion, is assumed.

### a. The Medical Evidence

Reliance's error in connection with this first issue, what Dr. Lasser is medically capable of doing, falls into four, inter-related categories. The first concerns defendant's persistent reliance on a Dr. Burke, an independent cardiologist who examined Dr. Lasser for Reliance. The second involves the weight placed on the New York Heart Association Functional Class scale, which purports to measure a patient's cardiac health based on the patient's physical capacity. Third, and related to the previous two, is Reliance's treatment of the issue of occupational stress. The last is directed to Reliance's assessment of the connection between risk, in this case risk of a heart attack, and capacity to perform.

The failings of Dr. Burke's analysis of Dr. Lasser's condition were explored in the February Opinion. In summary, Dr. Burke's examination of Dr. Lasser involved a treadmill test and other examination techniques calculated to reveal what Dr. Lasser's physical capacity was at the moment of the examination. Dr. Burke gave it as his professional opinion that "this individual does not demonstrate any cardiovascular disability." Three other reviewing cardiologists and two treating cardiologists provided written opinions which appear in the record of this case. Every other doctor involved came to a substantially different conclusion from Dr. Burke. Regarding the utility of Dr. Burke's treadmill stress test, Dr. Raska wrote that it "is absolutely not the standard of care" and "not known to be accepted as conventional to any clinical cardiologist." Dr. Lubow stated, "The fact that the test was not done in a manner accepted by all cardiologists raises a question about the qualifications of [Dr. Burke] who denied the patient's disability." RSL469.[3]

---

2. It has not been contested that Lasser's heart condition is the result of sickness, as defined in the policy, and the Court will consider this element of coverage established.

3. This citation is to the administrative record submitted as a trial exhibit and admitted into evidence. The page number and "RSL" prefix refers to the bates number sequence of the documents in the record.

Important omissions in Dr. Burke's opinion were identified by the other doctors. Most prominently, by focusing on transient physical capacity, Dr. Burke failed to appreciate the risk to Dr. Lasser posed by occupational stress. Indeed, there is no mention of this issue in Dr. Burke's report. By ignoring the question of occupational stress in relation to Dr. Lasser's cardiac health and what professional duties it is medically reasonable for him to perform, Dr. Burke is at odds with the formidable weight and, indeed, unanimity of the other cardiologists opining on this case.

In addition, key points were missing from Dr. Burke's analysis, leading other doctors to conclude that Dr. Burke had failed adequately to review the medical record before him. For instance, Dr. Aldrich pointed out that Dr. Burke failed to notice a lack of improvement between thallium stress tests taken in August of 1996 and April of 1997 because Dr. Burke's report did not mention the August 1996 test. RSL464. Dr. Burke stated that he reviewed records of a catheterization performed in October 1996, but Dr. Lubow points out that there was no catheterization on that date, but only one done in July 1996 which revealed important problems with Dr. Lasser's heart, problems not mentioned by Dr. Burke. Both Drs. Lowell and Lubow complained that Dr. Burke missed or ignored medical records indicating that Dr. Lasser's bypass graft had failed and that Dr. Lasser's heart had significant and deteriorating anatomical abnormalities.[4] RSL466, RSL469.

Dr. Burke, in a rebuttal letter solicited by Reliance, wrote: "It is not important what an individual's anatomical profile is as long as the risk factor prevention program is maximal and that function as far as can be determined ... is entirely within normal limits." RSL115. Dr. Burke made this statement in support of his conclusion that the opinions of Drs. Lubow and Aldrich were not "germane" to "the essential question of what is this individual's functional capacity in terms of being able to work." *Id.*

Here is revealed the flaw in Dr. Burke's approach. Dr. Burke believes that if a patient can, at any given moment, perform at a certain level and if risk factors are minimized as much as possible, then other problems, such as a failed and deteriorating bypass, occupational stress, and other factors pointing to a risk of a catastrophic medical event in the future, are "not important" and indeed, not even "germane" to the question of disability. It is obvious even to the lay person that a person might minimize risk factors for a heart attack and yet still be so sick that engaging in certain activities presents a medically unacceptable danger of future injury or death. This holds true even though, on any given day, that person might engage in such activities with no noticeable ill effect.

As will be seen below, this error has infected Reliance's entire treatment of the case. Yet, even on its own terms, Dr. Burke's reasoning is circular. He qualifies his position of no disability with the provi-

---

4. Dr. Lowell wrote:

No mention is made in Dr. Burke's letter of the presence of a failed bypass graft to the main vessel of Dr. Lasser's heart. This main vessel is now fed somewhat surreptitiously [sic] by another bypass graft which at 12 years of age is statistically likely to begin to fail in the not distant future. Addi-

tionally, this vessel is compromised by a 60% obstructive plaque. This critical anatomic point ought to have played a role in Dr. Burke's determination because of the likely role stress will play in Dr. Lasser's future health.

RSL466.

so, "so long as risk factor prevention is maximal." But the risk factor prevention cited by all five of the other doctors includes reducing Dr. Lasser's occupational stress by eliminating emergency surgery and on-call duties. Dr. Fields opined that, with these restrictions, Dr. Lasser could work forty hours a week, but the other doctors called for both the substantive restrictions on his duties *and* less than full-time working hours.[5] Dr. Burke's claim that with "maximal" risk prevention Dr. Lasser is not disabled does not respond to the points his colleagues raised and, in fact, strains credulity.

The testimony of Walsh reveals the extent to which Reliance relied upon the New York Heart Association Functional Classification system. This system has four levels of functionality for measuring the capacity for exercise of patients with cardiac disease. Level-four patients are unable to exercise at all without physical discomfort. Level one designates "[p]atients with cardiac disease but with no limitation of physical activity." RSL252. The system also contains a scale of grades A through E denominated "therapeutic classification." Grade-A patients need have no restrictions on physical activity; grade E must be at complete rest.

Dr. Burke rated Dr. Lasser as functional class one and therapeutic class A. Dr. Raska, perhaps the most vehemently critical of Dr. Burke's work, also rated Dr. Lasser as functional class one, but therapeutic class C ("ordinary physical activity should be moderately restricted and ... more strenuous physical efforts should be discontinued"). RSL252. Dr. Fields, in response to Walsh's question, also rated

Dr. Lasser as class one. RSL92. It is clear that Walsh considered the classification of fundamental importance. *See* Tspt. at 22, 29–30. Indeed, Walsh inquired of Dr. Fields whether stress could be discounted as a risk factor in patients classified as level one. RSL79.

Dr. Fields responded that stress could not be discounted, writing that "In essence, functional class and exercise performance can predict general prognosis but can not predict future cardiac events." RSL93. Dr. Fields went on to emphasize the need to apply such general guidelines of cardiac care to the individual case. *Id.* Regarding Dr. Lasser's partially successful and aging bypass, Dr. Fields stated "cardiovascular prudence restricts isometric activity, competitive sports, and other acute emotional or physiological stress events from which the patient cannot immediately withdraw." *Id.*

It is apparent from the text of the New York Heart Association classification form in the record that it does not address the issue of emotional and/or occupational stress. RSL252. The functional classifications are directed solely to the patient's physical exercise capacity. Even the therapeutic classes, which in any event were not mentioned by Walsh, address only whether limiting physical activity is necessary. Nothing in the New York Heart Association classifications provides explicit guidance regarding psychological stress, and Dr. Field's letter rejects the inquiry of Walsh seeking scientific evidence linking a class-one rating to a reduced role of stress as a heart attack risk factor.

As will already be clear, the medical evidence overwhelmingly supported the

---

5.  *See* RSL183 (Dr. Raska) (reduced schedule "absolutely necessary"); RSL464 (Dr. Aldrich) (any increase in work load beyond the reduced hours prior to the termination of benefits "would substantially increase his risk for future cardiac events"); RSL466 (Dr. Lowell) (cannot fulfill duties of "full time" orthopedic surgeon); RSL469 (Dr. Lubow) (citing change in schedule as part of medically indicated stress risk reduction).

fact that occupational stress posed a serious risk of further deterioration of Dr. Lasser's heart condition and of another heart attack. Speaking generally, Dr. Fields wrote: "[B]oth physical and emotional stress are identified triggers of acute myocardial infarction." RSL92. Dr. Aldrich said, "[S]tress is a well-documented risk factor not only for the development of coronary artery disease itself, but within that context to the precipitation of a myocardial infarction." RSL463. Likewise was Dr. Raska:

> Stress regardless of exercise tolerance is a recognized independent risk factor for recurrent coronary artery disease.... [T]here are multiple studies in both humans animals and in the laboratory which demonstrate that stress causes flux in the level [of] catecholamines in the circulation which have been shown to be a precipitant of acute myocardial infarction and sudden death.

RSL83–84.

The doctors were no less emphatic in relating the general proposition to Dr. Lasser's case. Dr. Lubow wrote, "However, the biggest risk to [Dr. Lasser] is physical and emotional stress that cannot be controlled easily.... Such stress is accepted by all experts as a significant risk factor in coronary artery disease." Dr. Lowell: "I contend that a less stressful environment would contribute to his graft longevity and subsequently his life." RSL466. Dr. Aldrich states pointedly that, with increased occupational stress, "Dr. Lasser's risk of myocardial infarction with all of its attendant morbidity and mortality will rise significantly." RSL463. Finally, Dr. Lasser provided to Reliance the report of his treating psychiatrist documenting the fact that Dr. Lasser experienced stress stemming from his return to an increased practice following the denial of his disability benefits.

In the backdrop of the other doctors' opinions, it is notable that Dr. Burke's report does not address occupational stress at all. The letter dated April 13, 1999, from Reliance purporting to set forth the reasons for denying Dr. Lasser's administrative appeal also makes no mention of the question of stress nor of its implications for Dr. Lasser. Finally, Walsh's testimony shows what weight was afforded the evidence of the danger of stress. This passage is illustrative:

> THE COURT: [quoting from Dr. Lieb's report] "I firmly believe that return to the reduced work schedule recommended by his cardiologist to lessen job related stress would be in his best interest and reduce the risk of jeopardizing his health and life."
>
> What weight, if any, did you give to that statement of Dr. Lieb?
>
> WALSH: Again, I didn't give it a great deal of weight, to be quite honest with your Honor. I hate to sound harsh but I would suggest that reducing stress would be in everybody's best interest.

Tspt. at 46.

Elsewhere, Walsh's answers to questions clearly intended to elicit what weight he placed on the issue of stress were simply evasive. See Tspt. at 80–84. It appears that Walsh was prepared to at least entertain the possibility of stress in connection with emergency and on-call duties, tspt. at 83, although Reliance has challenged even that finding. Plainly, Walsh did not consider occupational stress to be a significant factor in relation to number of hours worked excluding those specific activities. Tspt. at 81, 83. Elsewhere, he states again: "Everybody has stress in their life and I certainly understood that when I made the decision." Tspt. at 84.

Of course, everybody does not have Dr. Lasser's heart condition. Walsh's refer-

ences to the stress in "everybody's" life or that "everybody" would benefit from reduced stress are superficial at best. Juxtaposition of these references with Walsh's other testimony, *e.g.*, that "physical capacity played a great deal into my determination," tspt. at 81, other references throughout the transcript, and the witness's demeanor lead to a virtually inescapable inference. Dr. Lasser's supposed physical capacity drove Walsh's decision to deny benefits and substantially displaced consideration of the risk posed by occupational stress, which played a markedly less important role in the claims analysis. *See also, e.g.*, tspt. at 75. Courts have found in the context of analyzing a claim of cardiac disability for Social Security insurance benefits that it is reversible error to focus on physical capacity to the exclusion of emotional stress associated with work. *Schlabach v. Secretary of Health, Educ. & Welfare*, 469 F.Supp. 304, 315 (N.D.Ind. 1978). The relative lack of weight Walsh placed on occupational stress in assessing Dr. Lasser's disability claim cannot be squared with the medical evidence and is unreasonable on the facts of this case.

■ Finally, the Court cannot accept Walsh's analysis of risk of future harm in relation to present disability under the terms of the disability policy. It is a basic tenet of insurance law that an insured is disabled when the activity in question would aggravate a serious condition affecting the insured's health. *See Stark v. Weinberger*, 497 F.2d 1092, 1098–99 (7th Cir.1974); *Oppenheim v. Finch*, 495 F.2d 396, 398 (4th Cir.1974); *Stillwell v. Sullivan*, 1992 WL 401971, *6 (D.Kan., Dec.30, 1992). As noted in the Applemans' treatise, "The insured is considered to be ... disabled where it is impossible for him to work without hazarding his health or risking his life." 1C Appleman, *Insurance Law & Practice* § 651 at 241 (1981). In fact, this proposition is sufficiently well-settled that in many jurisdictions it travels under the name of the "common care and prudence rule." E.L. Kellett, Annotation, *Continuation of Work as Affecting Finding of Total or Permanent Disability within Insurance Coverage*, 24 A.L.R.3d 8, § 3(a) (1969); *see, e.g., McGowan v. Orleans Furniture Inc.*, 586 So.2d 163, 166 (Miss.1991); *John Hancock Mut. Life Ins. Co. v. Poss*, 154 Ga.App. 272, 267 S.E.2d 877, 880 (1980).

■ Insureds with heart conditions or who have experienced heart attacks provide an obvious context for the application of these principles. E.L. Kellett, Annotation, *Heart or Vascular Condition as Constituting Total or Permanent Disability within Insurance Coverage*, 21 A.L.R.3d 1383, § 3 (1968). Where medical prudence requires a cessation of work activity, the insured is disabled; insurers have failed to convince courts that risk of a heart attack in the future does not constitute a present disability. *Pompe v. Continental Cas. Co.*, 119 F.Supp.2d 1004, 1010 (W.D.Mo.2000) ("[S]uch an approach would force patients with serious health risks to cripple themselves, or even risk death, in order to be considered disabled.... The law is not so harsh.") (citing *Herring v. Canada Life Assur. Co.*, 207 F.3d 1026 (8th Cir.2000)).

This is true even though the insured may be capable of physical activity. *Honeysucker v. Bowen*, 649 F.Supp. 1155, 1162 (N.D.Ill.1986). Clearly the risk of a heart attack may be a disabling factor even though the claimant can sit, stand, or ambulate. *Schlabach*, 469 F.Supp. at 314; *Avemco Life Ins. Co. v. Luebker*, 240 Ark. 349, 399 S.W.2d 265 (1966).

Paraphrasing rather than quoting at length, Walsh testified on direct examination that he was aware that some of the doctors had linked stress to an increased risk of heart attack. *See* Tspt. at 32.

Walsh complained, however, that the doctors had not quantified the amount of increase. Tspt. at 32 ("[I]s it increased to 51% or is it increased to 5%? It wasn't clear."). In response to counsel's question, Walsh stated that if risk of a heart attack were "more likely than not," then the disability benefits would not have been denied. Tspt. at 32–33.

Counsel, in Reliance's submissions, has pursued this line of argument as further reflected in this exchange with Walsh at trial.

Q: Now, does this policy anywhere in the definition of disability or anywhere in the policy at all, does it say anything about paying benefits for prospective disabilities?

A: No, it doesn't.

Q: Potential disabilities?

A: No, it doesn't.

Q: Risk of relapse?

A: No.

Tspt. at 44–45. But even Walsh had previously conceded that a greater than 50% chance of a heart attack would qualify as a disability. The fact is that Walsh's testimony leaves no room for doubt that he was imposing his own assessment of the necessary probability of a serious medical event before a risk *in futuro* would be considered a disability.

It was not required that the cardiologists state a numeric percent of probability of a heart attack for them to conclude that, in their professional opinion, certain occupational stress posed a medically unacceptable risk of a heart attack. Nor was Walsh entitled to substitute his own, more-likely-than-not probability threshold for the judgment of the doctors. Moreover, as the authorities cited above establish, a medically unacceptable risk of a future heart attack and possible death may constitute a present disability under the poli-

cy, notwithstanding the suggestion of Walsh's testimony and counsel's arguments that Dr. Lasser's condition constitutes only an uninsured risk of harm in the future.

On April 13, 1999, Walsh wrote to Dr. Lasser's counsel denying the appeal from Walsh's earlier termination of benefits. This stands as Reliance's final denial letter and written opinion of the claims administrator. RSL45–48. In fact, the portion directed to the medical issues is not long and the entire letter is couched as a rebuttal to the arguments posed by counsel rather than as a comprehensive exposition of Reliance's grounds for denying the claim.

The most substantive point in Walsh's letter is the following: "Whether or not Dr. Burke's assessment was accurate, the information provided by every other physician involved in this case support our conclusion that Dr. Lasser can work on a full-time (40 hour per week) basis provided he avoid being on call and performing emergency surgery." RSL47. As noted above (*see supra* footnote 5) and in this Court's prior Opinion, this statement is in error. Only Dr. Fields opined that Dr. Lasser could work a forty-hour week. In its post-trial submission, Reliance has slightly modified its position, claiming only that no doctor specifically disapproved a forty-hour work week. While the other doctors did not state a maximum number of hours Dr. Lasser can work, the proposition that he can work full-time cannot fairly be reconciled with the overwhelming majority of the medical opinion available in this case as set forth in the doctors' opinion letters.

Walsh goes on to state that "It should be noted that even these restrictions [*i.e.* no emergency or on-call duties] are questionable given the fact that Dr. Lasser has demonstrated the ability to perform these

activities since the termination of his benefits." RSL47–48. Indeed, it is clear from Walsh's testimony that Dr. Lasser's return to on-call and emergency duties heavily influenced his decision to deny further benefits. *See* Tspt. at 24, 43, 44, 45–46, 83–84. Reliance persists in this view in its arguments before this Court. Defendant's Trial Brf. at 6 ("The fact that he was working proved that he was no longer disabled.").

■■■■ Obviously, where a disability consists of a danger of future negative health events, post-diagnosis employment does not necessarily negate the finding of disability. *Stark v. Weinberger,* 497 F.2d 1092, 1100 (7th Cir.1974). In the context of a disability where the claimant hazards his well-being by returning to work against his doctors' recommendations, return to work should not affect the benefits determination. 1C *Apppleman, supra,* § 651 at 242–45; *Kellett, supra,* 24 A.L.R.3d 8 § 3(a); *see also Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321, 1326 n. 6 (11th Cir.2001) ("We doubt that Levinson's status as a full-time employee constitutes evidence that he was able to perform the material duties of his occupation on a full-time basis."); *General Am. Life Ins. Co. v. Yarbrough,* 360 F.2d 562, 566 (8th Cir.1966); *Stillwell,* 1992 WL 401971 at \*6–\*7; *Johnson v. State Farm Mut. Auto. Ins. Co.,* 342 So.2d 664 (La. 1977). This is particularly true where a claimant is forced to work by economic considerations. *See Johnson,* 342 So.2d at 667; 10 Lee R. Russ & Thomas F. Segalla, *Crouch on Insurance 3d* 147:13.[6]

Dr. Lasser has testified by affidavit that he returned to on-call and emergency duties out of economic necessity caused by the termination of his benefits. No evidence has appeared to rebut this. The medical opinions in the record explained that the fact Dr. Lasser had not suffered a cardiac event following his return to work meant nothing in terms of the risk he was running nor the possibility that Dr. Lasser's condition would likely deteriorate as a result. Walsh's statement in his letter that Dr. Lasser's return to an increased schedule makes "questionable" the existence of Dr. Lasser's disability shows his misunderstanding of the nature of the disability involved. *See also* tspt. at 83–84 (Walsh testifying that Dr. Lasser "demonstrated the capacity to perform all of the other duties of his occupation and subsequently performed even those duties that you found too stressful").

Miscellaneous other testimony by Walsh leads the Court to question further whether he ever correctly understood the gist of Dr. Lasser's case that he was disabled. For example, Walsh testified that he gave Dr. Lieb's psychiatric report "very little weight," because it was the only psychiatric report offered, because Dr. Lieb's treatment was only for a three-month period, and because there was no claim that Dr. Lasser had been taking psychotropic medicines. Tspt. at 45–46. However, the point of Dr. Lieb's opinion was not to make a claim for a psychiatric disability.

---

**6.** Cases such as *Kaufman v. Provident Life & Cas. Inc. Co.,* 828 F.Supp. 275 (D.N.J.1992), *aff'd,* 993 F.2d 877 (3d Cir.1993), holding that continuous and regular employment will preclude a finding of disability are distinguishable. There is no suggestion in *Kaufman* that the claimant's return to work posed a risk to his health nor that he did so contrary to the express advice of his doctors. Moreover, Kaufman's return to work was obviously more complete and continuous than Dr. Lasser's. Claimant Kaufman earned over $600,000 per year while asserting he was disabled and he only reduced his activities, the district court found, to increase his prospects of continuing to receive disability benefits. 828 F.Supp. at 286.

Dr. Lieb's opinion was offered to establish the link between Dr. Lasser's normal duties as a fully-engaged orthopedic surgeon and the emotional stress Dr. Lasser was experiencing.

The reasons Walsh gave for discounting Dr. Lieb seem completely to miss the thrust of his opinion, focusing instead on whether there is evidence of a severe or long-term psychiatric condition. Indeed, elsewhere Walsh testified that he had no knowledge of whether on-call and emergency surgery would be stressful to Dr. Lasser. If Walsh had correctly understood the import of Dr. Lieb's opinion, this void would have been filled.

In sum, the Court finds that Walsh's conclusion that Dr. Lasser was not disabled cannot be reconciled with the medical evidence before him. Walsh's continued reliance on Dr. Burke's opinion and on the New York Heart Association functional capacity scale is plainly error. Neither authority, as demonstrated, even considers the issue of emotional stress as a risk factor for a heart attack.

In the face of the strongly worded and unanimous opinions of the other cardiologists, Walsh was not free to disregard occupational stress, clearly the primary threat to Dr. Lasser's cardiac well-being. The connection between Dr. Lasser's occupation and that stress was established by Dr. Lieb's opinion as supplemented by the treating and consulting cardiologists. For Walsh to discount this weight of medical opinion on the ground that "reducing stress would be in everybody's best interest," tspt. at 46, was an abuse of discretion.

To hold that the medical evidence supported a return to a forty-hour week is likewise clearly wrong. Disregarding Dr. Burke who saw no reason for any limitation at all, only Dr. Fields approved a forty-hour week, "restricting this to outpatient and consultative orthopedics."

RSL93. Dr. Lasser's treating cardiologist and three other cardiologists made it clear that a forty-hour week was contrary to their advice. During the administrative review process, questions were raised regarding the impartiality of Drs. Raska and Lubow because they came from the same practice group. Although counsel for Reliance continues to raise this issue, Walsh's final decision letter considered and dismissed this concern and termed Dr. Raska's opinion "comprehensive" and "objective." RSL47.

Under the arbitrary and capricious standard, the decision-maker may choose to credit some evidence over other evidence. The decision-maker may not, however, adopt what is so clearly the minority view, dismissing this substantial weight of medical authority for a contrary position, without at least some rational explanation for doing so. Even less so under the heightened arbitrary and capricious review applicable in this case may Walsh ignore the views of Drs. Raska, Lubow, Aldrich and Lowell. Thus, no reason is given for dismissing, for example, Dr. Raska's opinion that a reduced schedule is "absolutely necessary to maintain this patient's health" or the numerous similar opinions in the record. Walsh's and Reliance's repeated assertions that all of the doctors favored a return to a forty-hour week are unreasonable and, indeed, inexplicable. Certainly these bare assertions do not justify crediting only Dr. Field's opinion.

### b. The Vocational Evidence

Reliance's decision to deny Dr. Lasser's benefits is best seen as resting on two grounds in the alternative. First, Walsh found, unreasonably in the view of the Court, that Dr. Lasser's heart condition did not prevent him from working a full-time schedule or from performing on-call or emergency duties. In the alternative,

assuming that Dr. Lasser was disabled from on-call and emergency duties, Walsh ruled that these activities were not "material duties of [Dr. Lasser's] regular occupation." It will be noticed that this alternative argument takes as an underlying premise that a forty-hour week is still possible for Dr. Lasser, a point the Court has rejected *supra*.

It is, however, common ground that if providing emergency and on-call services are material duties of Dr. Lasser's regular occupation, and if Dr. Lasser is disabled from these activities, then Dr. Lasser is entitled to benefits under the policy even if he is otherwise able to work full-time. This is due to the provision in the policy that a disability permitting the insured to perform only a portion of his material duties on a full-time basis constitutes a total disability for the purposes of the policy. It is also common ground that Dr. Lasser's regular occupation was as an orthopedic surgeon and that he performed emergency and on-call services before being diagnosed with his disability. Much of the energies of counsel were directed to disputing whether emergency and on-call services are a material duty for an orthopedic surgeon.

Walsh has made it clear that he brings no personal knowledge to the question of what the "regular occupation" of an orthopedic surgeon might involve, what might or might not be considered emergency or on-call services, or whether such services are a material duty of an orthopedic surgeon. *See* Tspt. at 34, 101. The transcript contains the following exchange.

THE COURT: ... let's say the doctor goes to his office five days a week ... and your kid eight years old is playing on the playground, falls and breaks his arm, and you take him to the doctor at noon and the arm has to be x-rayed, set, cast put on. Is that an emergency?

THE WITNESS: I don't know if that's classified as an emergency or not.

THE COURT: Well, did you give any thought to it as to whether it's an emergency or not?

THE WITNESS: As I said, I thought about elective surgery in general. No I didn't think about that particular situation.

THE COURT: If that were to be considered an emergency, would that in any way influence your decision?

THE WITNESS: I don't believe it would.

Tspt. 28–29. Walsh testified that the information upon which he formed his opinion in this case was limited to the Department of Labor's Dictionary of Occupational Titles ("DOT") and the survey taken by an outside vocational consultant. Tspt. at 34.

The Court has already addressed the shortcomings in Reliance's analysis of the vocational issues. In its February Opinion, the Court found that the DOT is "far too blunt an instrument to be instructive as to the material duties of an orthopedic surgeon." 130 F.Supp.2d at 624. The DOT describes the occupation of a surgeon as evaluating patients and performing operations. As noted, "Orthopedic Surgeon" is identified as an "Undefined Related Title," "specializ[ing] in correction or prevention of skeletal abnormalities utilizing surgical, medical, and physical methodologies." RSL261.

The DOT does not disclose whether or in what proportion an Orthopedic Surgeon deals with emergencies. Indeed, as Walsh's testimony quoted above suggests, there is no information as to what would even be considered an emergency. Walsh refers to the possibility of elective surgery, but the DOT is silent regarding when, if

ever, elective surgery is performed by Orthopedic Surgeons. (Interestingly, the DOT does indicate that a surgeon's working conditions involve performance under stress.)

Presumably the DOT's "skeletal abnormalities" includes broken bones. In fact, common knowledge as supplemented by a generic dictionary suggests that such injuries are the bread and butter of a normal practice for an orthopedic surgeon. *See American Heritage College Dictionary* 965 (3d ed.1993) (including treatment of "injuries and skeletal disorders" in definition of orthopedics). As demonstrated above, Walsh did not know and did not consider whether treating a routine fracture was properly classified as an emergency. By logical implication, therefore, Walsh did not know or consider whether treating such an injury was a material part of an orthopedic surgeon's job. This is entirely consistent with his reliance upon the DOT, which, of course, provides no information on this point.

Walsh testified that the DOT was a mainstay of the long-term disability insurance industry. Tspt. at 115. This Court is not the only tribunal to find this authority lacking. *See, e.g., Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 253 (2d Cir.1999); *Pinto v. Massanari*, 249 F.3d 840 (9th Cir.2001) (DOT definition of hand packager was "generic" and did not adequately capture "varying abilities and job knowledge" required of persons with this job description) (internal quotation omitted); *Paige v. Bowen*, 695 F.Supp. 975, 980–81 (N.D.Ill.1988); *see also Wright v. Sullivan*, 900 F.2d 675, 684 (3d Cir.1990) (absence of job listing in DOT shows DOT not comprehensive, not that job does not exist). However, whether or not Walsh appreciated the shortcomings of the DOT's occupational definition, he testified that he decided to commission a survey to determine whether emergency and on-call duties were material duties of an orthopedic surgeon. The Court has already expressed its opinion of the survey in general terms in its February Opinion. Further study of the record and the testimony of Walsh only confirms the Court's prior view that this survey was fatally flawed in its execution and in Reliance's interpretation of it. In sum, the survey added nothing to the information base upon which Walsh relied for his decision.

The core question of the survey was: is it "reasonable to expect that an Orthopedic Surgeon can practice in this field" when disabled from performing emergency or on-call duties. *See* 103 F.Supp.2d at 624 (survey quoted in full). It is notable that the question does not ask whether emergency and on-call duties form a significant part of a typical orthopedic surgeon's practice. The question defines neither what is meant by "practice in this field" nor emergency or on-call duties. The vocational expert employed by Reliance opined that such a definition would be redundant to the intended recipients of the survey. RSL53. The omission is important, however, in light of the professed lack of knowledge on the part of the decisionmaker, Walsh. This lack of knowledge and the lack of specifics in the survey question mean that Walsh was forced to rely upon the results of the survey as a kind of net opinion, without permitting him to weigh by any logical process the validity or relevance of the answers he received.

This fact makes it only the more unfortunate that the questions in the survey were ill-framed. What "reasonable" may mean in this context is unclear. The phrase "practice in this field" only muddies the waters further. A respondent could well have believed that the hypothetical disabled orthopedic surgeon could practice in some capacity in the field of orthopedics,

but not necessarily as an orthopedic surgeon.

Indeed, one respondent took the trouble to point out this ambiguity, writing: "In your example, you are describing a physician who is not an orthopaedic surgeon, but might be considered an orthopaedist." RSL150. Other respondents may have construed "reasonable" to mean that it would be conceivable, or practicable, or even merely desirable that a disabled doctor could still practice "in this field" despite the stated restrictions. The central problem is that the question does not directly ask for the respondents' empirical observation of the real-world situation. Walsh's reliance on the survey, with its yes-or-no answers unadorned by any definition or explanation of exactly what duties the respondents are considering, was not well taken.

Reliance maintains that the follow-up questions remedy the lack of real-world connection for the central question posed. These ask the respondents to rank from "none to rare," to "occasional," or "frequent" the employment possibilities for the disabled orthopedic surgeon. Reliance believes that the frequency response "none to rare" should be considered to mean "rare" rather than none, by virtue of the positive response to the question is it "reasonable" that the disabled person could practice in the field. Finally, Reliance maintains that full-time employment as an orthopedic surgeon is implicit in the question.

The Court rejects each of these arguments. There is no reason that a respondent might not feel it would be "reasonable" for a restricted orthopedic surgeon to "practice in this field," (whatever that might mean) but that employment opportunities were in fact non-existent. Full-time employment is not implicit in the question. If, for example, the respondent believed that emergency surgery included setting a broken arm during office hours, then that respondent might well opine that a disabled doctor could practice "in the field" but that his opportunity to practice might be so reduced that full-time employment was impossible. The structure of the survey makes it impossible to rule out this possibility and Walsh, with his own professed lack of knowledge, is in no position to correct this shortcoming.

Finally, as noted previously, only fourteen responses were received from the one hundred addressees of the survey. Five stated that it was not reasonable for the restricted orthopedic surgeon to practice in the field, and thus furnished no further response. Three answered yes, but marked the "none to rare" response. Another respondent, providing further evidence of the ambiguity of the question, stated that practice in the field would be possible, but that the doctor would be limited to writing reports. As this Court has already found, this is not equivalent to practicing as an orthopedic surgeon. Thus, even of the small fraction of persons who took the trouble to respond to the survey at all, nine, or 64% could plausibly be understood to have meant that no employment opportunities for the restricted orthopedic surgeon existed at all. Stated otherwise, Reliance succeeded in securing only five responses out of the one hundred questionnaires sent indicating the employment opportunities for the hypothetical disabled orthopedic surgeon were better than "none to rare."

To maintain consistency with the February Opinion, the Court relies upon the survey responses submitted as Exhibit X to the Declaration of David J. Gruber submitted by plaintiff in opposition to the motion for summary judgment. For reasons not clear to the Court, the documents submitted at trial only contained nine re-

sponses. It may have been that Walsh only considered the nine responses while making his decision. If so, then reference to the larger number actually favors the validity of Reliance's survey.

If only the nine responses were before Walsh, then the Court finds that a fair reading of those responses would lead to either a five to four vote in favor of Reliance or an equal split in favor of Dr. Lasser, depending upon how one interprets a single ambiguous answer. *See* RSL151 (response number two). It should be noted, however, that from the more limited pool of nine responses only one ranked the job opportunities as better than "none to rare." In any event, for the reasons stated, the mere fact of a simple majority of responses cannot justify the reliance the insurer placed upon this survey.

In fact, there are a number of grounds upon which to question the reliability of the survey, even if one accepts Reliance's mode of analyzing the results. A letter from Reliance's vocational consultant states that the recipients of the questionnaire were selected from "various orthopedic surgeons affiliated with the AMA, American Academy of Orthopaedic Surgeons—1998 Board of Councilors Members, leading local medical schools, teaching hospitals, etc." RSL170. Did their selection, and the apparent emphasis on doctors in large institutions, influence the responses received? Why was the survey sent to only one hundred persons? Do fourteen (or nine) responses represent a statistically reliable sample of the profession; indeed, how many orthopedic surgeons are there in the United States? A document in the record titled "Overview of the American Academy of Orthopaedic Surgeons" claims the organization has 14,796 active fellows. RSL161. Yet, Walsh disavowed even a general impression of how many orthopedic surgeons practice in the United States. Tspt. at 40.

How should one interpret the small percentage of responses? Does the fact that a recipient responded mean that she or he was predisposed to agree with the premise of the survey's question and, if so, how then should one interpret the fact that 86 persons could not be bothered to reply? How can anyone know even whether the addressees of the survey questionnaire were the actual respondents, and not a member of the doctor's staff or even some unrelated party? An e-mail address is a notoriously unreliable identifier of the author of an e-mail.

None of these questions was addressed by Reliance or its outside vocational survey vendor. They are sufficiently obvious to the interested non-expert that they should have been raised by the insurer before relying upon this survey in a case of such importance. The Court finds that the survey was so obviously worthless as an authoritative measure of the material duties of an orthopedic surgeon that Walsh's reliance upon it must be deemed unreasonable.

However, Reliance's treatment of the small number of positive responses reveals a more fundamental error in its analysis of this case. All of the evidence, both medical and vocational, is relevant only to the extent it elucidates Dr. Lasser's situation in relation to the terms of the disability policy for which Reliance accepted premiums. The policy speaks of an inability to perform the "material duties" of one's "regular" occupation. Although courts have found that this language is not as helpful as it could be, *see Scammacca v. Royal Maccabees Life Ins. Co.*, 2001 WL 493427, *1 (9th Cir., May 9, 2001) (unpublished), the Court finds it sufficiently clear in this case to have guided the discretion of the claims administrator.

"Regular occupation," on its face, refers to that occupation in which the claimant is usually engaged, as opposed to a part-time or occasional professional activity. Although the Third Circuit has ruled in cases involving the same or similar policies, those cases did not present this precise issue and our Court of Appeals has not interpreted this specific language. The Second Circuit has held that "regular occupation" in a disability policy means a job of " 'the same general character as the insured's previous job, requiring similar skills and training and involving comparable duties.' " *Kinstler v. First Reliance Standard Life Ins. Co.*, 181 F.3d 243, 252 (2d Cir.1999) (quoting *Dawes v. First Unum Life Ins. Co.*, 851 F.Supp. 118, 122 (S.D.N.Y.1994)). The "regular occupation" concept does not limit the insurer to considering only the precise activities of the insured's previous job. It does, however, require "some consideration of the nature of the institution at which the claimant was employed." *Id.* at 253.

Thus, in *Kinstler*, the claimant was a director of nurses in a small health care agency whose job required some physical activity. The Second Circuit held that it was proper to consider this activity as a material duty, even though a director of nursing in a larger hospital would have an entirely sedentary position. 181 F.2d at 253. Similarly, the Fourth Circuit, in *O'Bryhim v. Reliance Standard Life Ins. Co.*, 1999 WL 617891, *8 (4th Cir.1999) (unpublished), looked to the duties the claimant actually performed, and not to the duties of an abstract job category to determine the material duties of the claimant's "regular occupation."

▮ This Court finds that the materiality of a given occupational duty depends upon the importance of that duty to the claimant's professional endeavors, measured as a combination of the amount of time the activity consumes and its qualitative importance to the professional mission. A duty is "material" when it is sufficiently significant in either a qualitative or quantitative sense that an inability to perform it means that one is no longer practicing the "regular occupation." The Court is careful not to limit the concept of a "regular occupation" to mean only the insured's previous job. However, the Court believes that a claims administrator considering an occupational disability claim must make some allowance for the mode in which the claimant practiced her or his profession. To rely solely on broad job classifications without some consideration for the geographical or institutional context ascribes a fungibility to the occupations of insureds that is consistent with neither reality nor the "regular occupation" formulation of the policy.

Reliance's treatment of the vocational evidence is in conflict with these basic policy fundamentals.

> THE COURT: What concerns, if any, did that cause you that only 14 out of a hundred responded and that there was submitted a lack of uniformity among the 14 that responded?
>
> WITNESS: True. It really didn't give me concerns, though, from my perspective. As I just said, we look to see if the job exists and is available. We don't necessarily look to see that it exists in plentiful numbers, and even with a limited number of responses, the number of them did say that it exists.

Tspt. at 40. The argument latent in defendant's counsel's direct question of Walsh further demonstrates the error in Reliance's approach.

> COUNSEL: Do you consider somebody totally disabled if you can't find them a job? In other words, is it your responsibility to find somebody a job?

WITNESS: Not at all, no. Tspt. at 39. Walsh makes it clear that neither the number of available positions nor their geographic location makes a difference to Reliance as long as the job is "available." *Id.*[7]

It is intuitively obvious that this viewpoint cannot be reconciled with the facts of this case and the language of the policy. Here the claimant practices a relatively common and familiar medical specialty in the northeastern United States. Reliance would tell disabled claimants that because a nationwide survey has discovered five members of their profession (assuming the respondents were in fact the addressees of the survey) who believe that a person with the claimant's disabilities could practice (whether in the rural South, the steppes of Nebraska or Hawaii matters not),[8] that such claimants can still function unimpaired in their established line of work. Reliance cannot seriously contend that this is the premise upon which their insureds purchase disability policies. Walsh believes that if at least one job with the claimant's professional title exists with the claimant's particular restrictions, the claimant can perform the "material duties" of the claimant's "regular profession." This is not a rational interpretation of the terms of the policy.

The logical flaw inherent in the vocational survey is as follows. The only issue upon which a survey such as the one conducted in this case could possibly be relevant is to determine what the material duties of an orthopedic surgeon actually are. Orthopedic surgeons would have useful knowledge on this point and could be surveyed regarding what duties they actually perform, what proportion of their time each such duty occupies, and what duties they consider central to their role in the medical profession as "orthopedic surgeons."

In addition, it would have been highly relevant if the survey had been directed to surveying orthopedic surgeons practicing in small-practice settings. It will be recalled that Dr. Lasser was one of four doctors at Townsquare Orthopedic. It is too obvious to be belabored that, in a small practice, on-call and emergency surgery may be more material to a doctor's occupation than for a practitioner at a large medical center.

On a more fundamental level, by posing a hypothetical question of whether it would be "reasonable" for an orthopedic surgeon with Dr. Lasser's restrictions to practice, and asking for the prevalence of job opportunities, Reliance and Walsh misconstrued the concept of occupational disability con-

---

7. The Court notes that this marks an abandonment of Reliance's previous position that a majority of the survey respondents favored its position. It is clear from Walsh's testimony that if *any* respondents had favored Reliance's position, the claim would have been denied.

8. The Court rejects the implication of Walsh's testimony that he discounted the survey respondent from Alaska, but weighed more heavily the response purporting to come from Newark's University of Medicine and Dentistry. Tspt. at 108–09. Reliance, having commissioned a survey intended to provide a statistically meaningful sampling of the orthopedic surgeon's profession nation-

wide, cannot change horses and advance the response of one respondent as representing the expert opinion of a local practitioner. Moreover, even acknowledging that the rules of evidence do not bind plan administrators, for Reliance to consider an unverified e-mail response to such a flawed survey as evidence of expert local opinion would be completely unreasonable. In any event, the Court will take Walsh at his word and conclude from his testimony that he considered neither the professional affiliation nor the geographic distribution of the responses and that his opinion would not have been altered if he had. Tspt. at 109.

tained in the policy. The following example will illustrate. One may readily imagine arcane or near-obsolete occupations, perhaps that of farrier[9] or pipe-organ builder, in which employment opportunities are exceedingly rare. The frequency or number of available openings for partially disabled farriers or pipe-organ builders has nothing to do, however, with defining the material duties of those positions. The relevant data is what tasks occupy the talents of those farriers or pipe-organ builders who are actually employed in the field, however few or numerous they might be. Should these occupations sadly die away all together, their practitioners will not be "disabled" but merely unemployed. Conversely, a farrier who cannot shoe horses cannot perform a material duty of that occupation, regardless of whether there are any job openings in the field.

In fact, Reliance's approach to vocational surveys blurs the line between occupational and general disability policies. As noted, a general disability policy only provides benefits if the claimant is disabled from any work for which he is reasonably suited by education, experience, etc. The focus is what the claimant can do and what jobs exist; the existence of any suitable job that the claimant can do will disqualify the claimant. Occupational disability, as discussed, depends upon defining the claimant's regular occupation and then evaluating whether the claimant can perform that occupation.

Consequently, in *Saffle v. Sierra Pacific Power Co. Bargaining Unit Long Term Disability Income Plan*, 85 F.3d 455, 459–60 (9th Cir.1996), the administrator erred when it construed an occupational disability plan to deny benefits when there was work available for which the claimant was qualified and that she could do with an accommodation. This was error even though the vocational experts used the same job description as the claimant's prior position. As explained in *Ross v. Indiana State Teacher's Ass'n Ins. Trust*, 159 F.3d 1001, 1011–12 (7th Cir.1998), *cert. denied*, 525 U.S. 1177, 119 S.Ct. 1113, 143 L.Ed.2d 109 (1999), in *Saffle* the administrator evaluated the claimant's employability with a modification of her duties, an accommodation that was "essentially outside of the realm of Saffle's regular job." *Id.* at 1011.

This "collapses the threshold for occupational disability into the standard for general, or permanent disability." *Saffle*, 85 F.3d at 459. The survey Reliance commissioned asked whether, after modifying Dr. Lasser's job to exclude stressful duties, work was available for him. Walsh interpreted the results of the survey to mean that if an orthopedic surgeon with these limitations could find employment in the field, he was not occupationally disabled. Left unanswered was whether those stressful duties were a material part of the duties of an orthopedic surgeon in Dr. Lasser's general type of practice.

Some of the e-mail responses to the survey suggest that the occupational/general disability distinction was blurred in the minds of the respondents as well. For instance, some said that an orthopedic surgeon unable to do emergency or on-call duty could practice, but made clear that this practice would be sharply modified from the norm. One wrote: "there are jobs out there that orthopedic surgeons can do, ie. office practice only." RSL150. Another stated: "if in community—no; academic possible." RSL149. Indeed, this result appears clearly in the narrative finding submitted with the results of the survey, which held that "this type of work setting [i.e. one without emergency and/or

9. One who shoes horses.

on-call surgery] typically involves special circumstances and these circumstances are available only rarely or occasionally. . . ." RSL169.

This approach is appropriate for a general disability inquiry. It is not appropriate when considering an occupational disability claim. To repeat: the polestar is defining the "regular occupation" and whether the claimant can perform it, not whether the disabled claimant can find work. The survey does not permit one to form an opinion of what the material duties of Dr. Lasser's (or any other orthopedic surgeon's) "regular occupation" might be. In framing the survey, Reliance and its vocational survey vendor were proceeding from an interpretation of the policy that cannot be reconciled with its plain language. *Saffle*, 85 F.3d at 459 ("As manifest in Robertson's instructions to the experts, the Committee construed 'regular occupation' as 'work available for which she is qualified that would have enabled her to work with her feet elevated' and to remain sedentary virtually always. This construction is inconsistent with the plain language of the Plan. . . .").

Thus both of the two sources of information upon which Walsh relied to inform him regarding the material duties of Dr. Lasser's occupation, the DOT and the vocational survey, were wholly inadequate. The DOT is not sufficiently detailed to provide any meaningful guidance in this case. The vocational survey was so flawed in its execution and misguided in its conception as to be worthless. Notwithstanding, Walsh disavows any general or common knowledge regarding what an orthopedic surgeon might normally do. Consequently, these two authorities form the sum of the information adduced by Reliance to answer the central question in this matter.

Here, Reliance falls back upon a procedural argument, contending that it was Dr. Lasser's burden to establish what the material duties of his regular occupation were and that he was unable to perform them. Claiming that Dr. Lasser has failed to carry this burden, Reliance maintains he has failed to prove the elements of coverage and that the company was free to deny the claim. This Court has recognized that the burden of proving coverage rests upon the claimant, and that there is no duty on the insurer's part to investigate the substantive details of a claim. *Lasser*, 130 F.Supp.2d at 628 (citing *Pinto*, 214 F.3d at 394 n. 8). Contrary to the contentions of counsel, however, the Court does not agree that without the DOT and vocational survey the record is simply empty regarding the material duties of Dr. Lasser's occupation. On the contrary, while not as plentiful as Dr. Lasser might wish, he has adduced sufficient evidence to determine parameters of his occupation, at least with respect to emergency and on-call duties. Moreover, this evidence stands unrebutted.

The most direct of this evidence is Dr. Lasser's own affidavit. RSL473–79. Dr. Lasser testifies that he discontinued emergency and on-call duties, which, in conjunction with reduced hours, caused a dramatic drop in his income. When Reliance discontinued his disability benefits, Dr. Lasser resumed on-call and emergency surgery, although he avers that he did not resume full-time practice. Dr. Lasser did this, knowing that he risked his health, to increase his income to make up for the loss of benefits. From this, two points emerge. First, it is clear from the fact that Dr. Lasser discontinued emergency surgery and on-call duty in an attempt to alleviate stress in his occupation that these activities formed some measurable part of Dr. Lasser's practice before he became disabled. There would be little stress abate-

ment in stopping an activity one seldom engaged in anyway. Second, the fluctuation in his income, partially cured by resuming emergency and on-call duties, indicates that these duties were significant to his overall professional activity.

Additional evidence as to the materiality of emergency and on-call duties lies in the medical opinions of the cardiologists. Walsh, testifying based upon prior experience, opined that the cardiologists' information came largely from Dr. Lasser. However, at least with respect to Dr. Lasser's treating cardiologist, it was in Dr. Lasser's interests accurately to inform him of his daily activities in order to obtain an effective program of rehabilitation. Indeed, it is based on this indicium of reliability that such out-of-court statements by Dr. Lasser would be admissible under the Federal Rules of Evidence. Fed.R.Evid. 803(4); *see* 2 John W. Strong, *McCormick on Evidence* § 277 at 247 (4th ed.1992).

Walsh explained that he does not usually credit the statements of physicians regarding the material duties of a claimant's occupation. He claimed that, in his experience, physicians rely on what their patients claim their professional duties are, and that the company's subsequent investigation frequently shows that the physician's assumptions regarding occupational requirements are in error. Tspt. at 104–05.

The Court cannot accept this as a reasonable basis for discounting entirely the cardiologists' assessment of Dr. Lasser's regular occupation. First of all, as already discussed at length, Reliance conducted no subsequent investigation worthy of the name. Thus, the only basis for discounting the cardiologists' opinions regarding Dr. Lasser's material occupational duties is Walsh's prior experience in other cases. However, there is no basis to suppose that Walsh's grounds for discounting the medi-

cal opinions in the unspecified other cases to which he refers are any more valid than in this one. When one considers that the rationale advanced for discounting the medical testimony in those other cases may be Walsh's perceived experience in this case, the speciousness of his reasoning is apparent.

Nor is Dr. Lasser the only source of information regarding what an orthopedic surgeon is required to do. The cardiologists are, after all, medical professionals and can be expected to have some understanding of an orthopedic surgeon's duties. Dr. Aldrich wrote:

> Based on my knowledge of Dr. Lasser's cardiac condition and the demands of his profession, it is my opinion that he is disabled. I do not feel that he is capable of resuming all of the customary duties and responsibilities of an orthopedic surgeon on a full-time basis or at least that he could not do so without exposing himself to a high degree of risk.

RSL462; *accord* RSL470 ("Dr. Lasser cannot function at full capacity as an orthopedic surgeon without undue risk to his health and life.") (Dr. Lubow); RSL466 (Dr. Lasser's heart problems "have a direct and negative impact on his ability to perform the duties and responsibilities of a full time orthopedic surgeon") (Dr. Lowell); RSL93 ("I agree ... that Dr. Lasser is not capable of resuming all of the customary duties and responsibilities of an orthopedic surgeon.").

In his opinion letter, Walsh rejected the cardiologists' opinion that Dr. Lasser was disabled from his profession, arguing that they had no expertise in vocational matters. Knowledge of the material duties of a particular profession cannot logically be limited only to members of that profession nor to experts in vocational science. Others may have a working knowledge of such

matters. Moreover, Walsh's argument is seriously undermined by the fact that he was willing to assume that the consulting cardiologists were familiar with the duties of an orthopedic surgeon when he sought their opinion. Tspt. at 76–77. He directly inquired of Dr. Burke regarding those duties. Tspt. at 105–06. A claims administrator might, in his discretion, discount the opinion of a treating or consulting physician on occupational matters in favor of evidence from a vocational expert. Here, however, there exists no such alternative evidence that could rationally be considered reliable, and the evidence supplied by the doctors and directly from Dr. Lasser stands unchallenged.

Reliance is incorrect, therefore, when it argues that Dr. Lasser has failed to produce evidence in his favor on whether emergency and on-call duties were material duties of his regular occupation. It would surely have created a more compelling showing had Dr. Lasser consulted his own vocational experts. However, the circumstantial evidence of the fluctuation in his income, Dr. Lasser's own affidavit, the opinions of the cardiologists, and the evidence of causation provided by the psychiatrist Dr. Lieb cannot be disregarded. For Walsh to do so in this case was unreasonable, particularly in light of Reliance's failure to adduce reliable vocational evidence of its own.

### 3. Application of the Appropriate Standard and Summary of the Holding

Much effort has been expended by the Court in stating its view of the proper application of the "sliding scale" version of arbitrary and capricious review under the *Pinto* case. While this effort was necessary and well-spent, as a practical matter it now appears to have been an academic exercise. The Court finds that even under its most deferential iteration, arbitrary and capricious review requires that the denial of Dr. Lasser's benefits be reversed. It follows, of course, that under *Pinto*'s heightened arbitrary and capricious standard, Reliance's decision cannot stand.

Disability benefits decisions are always important cases to the disabled employee. The importance of this case is only made more plain because Dr. Lasser's benefits are comparatively substantial in financial terms. Having tried this matter and having had the opportunity to evaluate the testimony and other evidence at first hand, the Court finds that the method by which Reliance analyzed this disability claim is simply not appropriate for a matter of this magnitude and importance to the persons involved.

On the contrary, Reliance has exhibited a level of care which, joined with an apparent predilection to rely on standardized techniques and categorizes, cannot be squared with the sensitive inquiry these important, *sui generis* cases require. The Court is constrained to note that Walsh is not highly experienced, having graduated from law school in 1995. It is perhaps not surprising that he should place undue weight on the DOT because it is widely used in his industry, at the expense of exercising his own critical faculties to determine whether the DOT is a useful guide in the case actually before him. Likewise, the Court finds that the numeric clarity of the New York Heart Association classification obscured in Walsh's mind the less easily quantified but real danger of a heart attack or other cardiac injury posed by occupational stress in Dr. Lasser's work.

Walsh is plainly an intelligent and capable young lawyer. The error here is institutional; Reliance invites error by placing an attorney such as Walsh in the role of sole and unreviewable decision-maker in this type of case. And the errors here are glaring. Counsel trumpets an alleged lack

of "objective proof" of Dr. Lasser's condition and claims that such proof is a "requirement" of disability coverage. Yet the anatomical problems with Dr. Lasser's heart and the undeniable fact of his heart attack are surely objective indicators of a serious problem, and even Reliance does not deny that Dr. Lasser has a heart condition. Nor, for the reasons set forth, can the Court accept Reliance's arguments that the risk of future death or serious injury posed by continued employment cannot constitute a present disability.

Of course, flaws in methodology and errors of analysis are secondary and only reveal rather than constitute direct evidence of an arbitrary and capricious decision. It is the evidentiary record that controls. Overwhelming medical opinion in this case leaves no room for reasonable argument. Dr. Lasser is seriously ill, regardless of any quibble over whether the evidence of such disability is "objective" or otherwise. Continuing with his former professional activities without substantial modification of his duties and lessening of hours worked poses a medically unacceptable risk to his well-being. The policy requires no more.

Nor does Reliance's fall-back position, that emergency and on-call duties are not material to Dr. Lasser's occupation, carry the day for the insurer. Ignoring momentarily the profound conceptual flaws in the vocational survey commissioned by Reliance, that document indicates, at most, that orthopedic surgeons practice without being able to perform such duties only infrequently or in specialized and/or administrative work settings. What other evidence exists on the point shows that emergency and on-call duties are a substantial part of the occupation of a small-practice, orthopedic surgeon. Remaining true to the terms of the policy as covering occupational rather than general disability

requires the conclusion that Dr. Lasser is disabled by virtue of his inability to perform these functions.

Reliance argues that there was at least some evidence in its favor and that this requires upholding its decision under the arbitrary and capricious standard. However, for the reasons expressed by the other doctors, Dr. Burke's opinion is too patently suspect to be considered over the numerous other contrary medical opinions. Dr. Burke's letter of rebuttal does not successfully address the flaws found in his opinion, and no other reasons have been advanced why Walsh properly could have given Dr. Burke any weight in his decision. The problems with the vocational analysis have also been explored. For the reasons expressed, the evidence adduced by Reliance simply does not support its position. It cannot, therefore, furnish sufficient grounds to uphold the decision under the arbitrary and capricious standard.

It should be obvious that, due to the special problems raised by the rule of *Pinto*, this Court has studied this record and considered the testimony of Walsh closely. The Court believes that, even under the regular arbitrary and capricious standard, the decision must be reversed. Applying the slightly less deferential standard appropriate where a structural conflict of interest exists, the Court would certainly set aside the denial of benefits. Because the Court finds that Dr. Lasser has established his entitlement to disability benefits under the policy at issue in this matter, the Court will enter judgment in his favor.

## CONCLUSION

For the reasons set forth above, which constitute the Court's findings of fact and conclusions of law in this matter, the Court finds that defendant Reliance wrongly denied Dr. Lasser the disability insurance benefits he was entitled to under the policy

of insurance that is the subject of this litigation. Pursuant to the terms of that policy and as provided by the Employee Retirement Income Security Act, Dr. Lasser is entitled to those disability benefits. Judgment will be entered in Dr. Lasser's favor accordingly.