Jeremy J. SMITH, Plaintiff–Appellee,
Cross–Appellant,

v.

EQUITABLE LIFE ASSURANCE SOCI-
ETY OF the UNITED STATES, Defen-
dant–Appellant, Cross–Appellee.

Nos. 94–2396, 94–2714.

United States Court of Appeals,
Seventh Circuit.

Argued Feb. 9, 1995.

Decided Sept. 28, 1995.

Mark D. DeBofsky (argued), DeBofsky & DeBofsky, Chicago, IL, for Jeremy J. Smith.

Thomas Wilson Waters (argued), Peter P. Dressler, Kemp, Grzelakowski & Lorenzini, Oak Brook, IL, for Equitable Life Assurance Society of United States.

Before BAUER and COFFEY, Circuit Judges, and CRABB, District Judge.*

COFFEY, Circuit Judge.

In 1986, Equitable Life Assurance Society of the United States (Equitable) issued a disability insurance policy to Jeremy Smith that provided a monthly insurance benefit of $4,000 if Smith became totally disabled and could not continue in his regular occupation, which at that time was being the manager of a computer company. In 1988, Smith developed an acute anxiety disorder accompanied with agoraphobia, which left him unable to continue executive duties. In 1991, he applied for the disability benefits. After initial acceptance of Smith's application, Equitable refused payment and Smith brought suit in state court. The case was removed to feder-al court and, after a bench trial, judgment was rendered awarding Smith $164,247.88 in disability benefits, premiums, and statutory penalties, as well as attorney's fees and costs. Equitable appeals the judgment; Smith cross-appeals, claiming that he should have received pre-judgment interest. We affirm the district court's decision with respect to Equitable's appeal and reverse with respect to Smith's cross-appeal.

## I. Background

In the early 1980s, Jeremy Smith founded and was the president of a computer company, PC Distributing. At that time, Smith also had a history of panic attacks, characterized by what he described as an "overall feeling of dread." In 1982, he checked into Glenbrook Hospital, in Glenbrook, Illinois, suffering from such an attack and fearing that his heart might fail. Smith's heart was diagnosed as healthy, but the treating physician referred him to a psychiatrist. From February to August, 1984, Smith was under the care of Dr. Levy, a psychiatrist, who prescribed anti-anxiety drugs to combat Smith's condition. In 1985, Smith visited Dr. Ekeberg who also treated his anxiety.

In 1986, Smith was the president and chief executive officer of PC Distributing, which employed over fifty individuals and had sales in excess of $20 million. Smith had complete managerial responsibility at that time, including the negotiating of contracts, training personnel, working with attorneys and accountants, as well as participating in trade shows and seminars.

In 1986, Smith applied to Equitable for an income insurance policy, to provide a monthly indemnity in the event he should become disabled. Equitable requested information regarding any treatment or examination by a physician or psychiatrist for the past five years and Smith gave the following response:

Routine check-up with Dr. Ekeberg. Everything OK.

Geoffrey Levy, M.D., Arlington Heights, IL 60004

---

* Hon. Barbara B. Crabb, Chief Judge for the Western District of Wisconsin, is sitting by designa-tion.

Psychiatrist seen in June 1984 for 3 weeks re mild anxiety. Treated with Xanax for couple months. No treatment since, everything OK.

Dr. Tom Neuman referred to Dr. Levy re anxiety. Glenbrook Hospital outpatient.

(R. 5 at 4; Pltf. exhibit A). Equitable contacted Dr. Levy and conducted an underwriting investigation. As a result of the investigation, Equitable modified the policy and approved Smith's application. The policy issued July 7, 1986, providing for a monthly income in the event of total disability, which was defined as follows: "TOTAL DISABILITY means your inability due to injury or sickness to engage in the substantial and material duties of your regular occupation. It will not be considered to exist for any time you are not under the regular care and attendance of a doctor." (R. 5 at 8; Pltf. Ex. 1). The policy included a description of Smith's occupation: "President/CEO [of a closely held corporation] executive and administrative dealing in purchase of computer hardware for resale." (R. 5 at 4; Pltf. Ex. 1).

In August 1986, PC Distributing was taken over by outside shareholders and its name changed to PCx Corporation.

In the summer of 1987, the frequency and intensity of Smith's panic attacks increased and at their onset he would have or would incur sweaty palms, cold extremities, constriction of throat and difficulty breathing, increased heart rate, inability of his legs to function, loss of peripheral vision, and a feeling of losing control. It was at this time that a psychiatrist diagnosed panic disorder accompanied by agoraphobia.[1] Smith's employment at PCx was terminated in November 1987 when the new owners of the corporation told Smith that they had found a replacement for him. Smith did not hold or apply for a job until March 1994.

In 1988, Smith's symptoms became progressively worse: he refused to visit restaurants and movie theaters and did grocery shopping at three o'clock a.m. to avoid crowds. This continued into 1989, when Smith experienced panic attacks three or four times daily, including palpitations and irrational fears for his physical well-being. He testified that he could not leave his home for long periods of time, refused to answer the telephone, and only occasionally had what he described as a "good day." Smith would often shake uncontrollably, sweat profusely, and feel flushed. Fearful of travel, Smith would not take airplane flights and avoided public places and any type of activity that he associated with panic attacks.

In 1988, Smith joined the Auxiliary Coast Guard. He testified at trial that he enrolled in order to help himself become adjusted to social situations and to help confront his anxieties. He attempted to teach classes to four or five students concerning basic sailing and boating techniques. However, the panic attacks persisted and Smith often canceled his classes or left the teaching up to a co-instructor.

From 1988 until the trial, Smith was under the care of Dr. Higgins, an internist who prescribed various anti-anxiety drugs, including Xanax, Buspar, and Prozac. In 1990, Dr. Higgins referred Smith to a psychiatrist who in turn referred him to an anxiety disorders clinic.

In February 1991, Smith started treatment at the Anxiety Disorders Clinic at the University of Health Sciences of the Chicago Medical School. Smith received treatment from a therapist at the clinic who was a doctoral student in clinical psychology. Each week the therapist would discuss Smith's progress with Dr. McNally, the director of the clinic's treatment program. Dr. McNally supervised Smith's therapy until May 1991, when Dr. Calamari became the director of the clinic. Throughout this time, Smith continued to take anti-anxiety medication pre-

---

1. Agoraphobia is "a complex phobic disorder characterized by marked fear of being alone or of being in public places where escape would be difficult or help might be unavailable if something alarming were to happen and by avoidance of such situations to a degree that severely limits normal activities, e.g., an agoraphobic may remain at home unless in the company of a friend or relative; in some cases anticipation of exposure to the public situation brings on panic attacks." *Dorland's Medical Dictionary,* 39 (27th ed. 1988).

scribed by Dr. Higgins. Smith remained in the treatment program until June 1992, when he left due to a misunderstanding believing that the treatment was complete. Dr. Calamari testified that Smith had not fully recovered at that time. At trial, Smith testified that his condition in 1993 improved, but he was forced to return to the clinic in 1994, six weeks before the trial.

In March 1991, Smith applied for benefits, claiming that he was totally disabled from January 1988 because he was no longer able to participate in meetings, interviews, negotiations, or travel.

The required medical forms attesting to Smith's disability were submitted by Dr. McNally, the doctor who initially admitted Smith to the anxiety disorders clinic.

In May 1991, Dr. Calamari submitted an attending physician's statement to Equitable, in which he diagnosed Smith as suffering from panic disorder and agoraphobia and found Smith to be totally disabled and unable to perform in his regular occupation because he was unable to travel, attend meetings, keep appointments or speak in public.

Initially, Equitable made payments on Smith's claim, totalling $20,000. However, in August 1991, Equitable consulted a psychiatrist in New York, Dr. Berc, who evaluated Smith's claim and spoke by telephone with Dr. Higgins, Smith's treating physician, for five minutes. Although Dr. Berc never examined or interviewed Smith, he concluded that Smith's condition was residually disabling, and not totally disabling because Smith was not completely housebound. An Equitable representative testified that on the basis of Dr. Berc's recommendation, Equitable terminated Smith's benefits, effective November 1991. As part of an attempted settlement, Equitable paid Smith a further $2,000 in the summer of 1992, but refused any further payment.

In February 1993, Smith filed a complaint in state court, seeking recovery of disability benefits and statutory penalties against Equitable for vexatious and unreasonable delay. Equitable removed the case to federal court and filed a counterclaim, seeking rescission of the insurance contract based on alleged material misrepresentations by Smith regarding his medical history.

In December 1993, after the suit was filed and removed to federal court, Dr. Ganellan, a clinical psychologist hired by Equitable, examined Smith and conducted a series of tests, and concluded that Smith was not totally disabled. Smith however stated that in 1993 his condition was much improved compared to 1991, when he first applied for benefits.

In April 1994, Smith returned to work as a chief operating officer of a computer reselling company, supervising fifteen employees.

In August 1994, a bench trial was held before Hon. Samuel P. King, visiting district court judge from the district of Hawaii. Medical testimony essentially consisted of four physicians, two for Smith and two for Equitable.

Dr. Calamari, a licensed clinical psychologist and supervisor of the anxiety disorders clinic at the Chicago Medical School, testified that he diagnosed Smith as suffering from panic disorder with agoraphobia based on the clinic's initial diagnosis and the ongoing reports of Smith's therapist, who Dr. Calamari supervised. According to the testimony of Dr. Calamari, agoraphobia can be highly idiosyncratic, where patients associate only certain activities with panic attacks, depending upon the patient's history. He further testified that meetings and social interaction were a focal point of Smith's anxiety because Smith feared that escape from such situations in the event of a panic attack would be embarrassing or difficult. Thus, Smith would avoid certain situations where he feared a disabling panic attack might occur; the fear was so controlling that Smith would be housebound for days and would often be unable to and forced to refuse to participate in activities normally expected of a business executive. According to Dr. Calamari, panic attacks and agoraphobia often runs in families and new research has revealed an underlying biological component to the disease. Treatment programs comprise of anti-anxiety drugs to combat the physical effects of panic and psychological counseling to educate patients regarding their anxieties and to help control their responses to stressful situations.

Focussing on the psychological component, Dr. Calamari's clinic would attempt to gradually expose the patient to certain activities until the intense fear associated with the situation has been reduced to a manageable level.

When Smith left the program in 1992, he still suffered from the condition and, according to Dr. Calamari, was unable to perform the tasks indigenous to his profession.

Dr. Higgins, Smith's treating physician, was unable to attend the trial and his deposition was entered into evidence. Although Equitable objected to this, the district court found that the requirements of Rule 32 of the Federal Rules of Civil Procedure had been satisfied and allowed the reception of the deposition in evidence. Dr. Higgins stated that Smith had been his patient since 1988 and that he had prescribed various drugs for his panic attacks, with mixed success. Dr. Higgins concluded that Smith was totally disabled from continuing in his occupation because of his inability to conduct meetings and travel.

Dr. Berc, a licensed psychiatrist, testified for Equitable and stated that intermittent illnesses such as panic disorders are usually classified as residually disabling, and not totally disabling, unless the patient is housebound. However, Dr. Berc acknowledged that his conclusion was medical and that each income insurance contract defined the parameters of total disability with respect to the policyholder's specific occupation and that he was unfamiliar with the definition in Smith's case.

Dr. Ganellan, a clinical psychologist, also testified for Equitable and stated that Smith was referred to him in order to evaluate whether Smith's anxiety disorder would prevent him from being able to manage the duties of an executive in the computer industry. Having examined Smith in November 1993, two-and-one-half years after his application for benefits, Dr. Ganellan concluded that Smith was exaggerating his psychological difficulties and was not totally disabled from engaging in his profession.

As well as the medical testimony, Smith presented several witnesses who knew him during the period of his disability and attested to his condition. The district judge announced his decision in open court, finding for Smith on all counts: there was no material misrepresentation that would justify rescission of the contract; Smith was totally disabled within the meaning of the policy, from January 1988 to March 1994; and Equitable's actions warranted penalty under Illinois Insurance Code section 5, 155(b), for unreasonable and vexatious delay in payment of benefits. With regard to the statutory penalty, the district court chose $10,000 and reasonable attorney's fees as the appropriate penalty. However, the court refused to award any pre-judgment interest to Smith.

Equitable appeals, claiming that there was insufficient evidence to find Smith totally disabled, Smith did not comply with the conditions of the policy, the district court erred in not rescinding the policy, and the district court should not have awarded a penalty for unreasonable and vexatious delay. Smith cross-appeals, claiming that it was an abuse of the trial court's discretion to deny him pre-judgment interest.

## II. Analysis

Jurisdiction for this case arises from the diversity statute, 28 U.S.C. § 1332(a)(1).[2] "Sitting in diversity, we apply the law of Illinois, attempting to predict how the Illinois Supreme Court would decide the issues presented here." *Thoele v. Aetna Casualty & Surety*, 39 F.3d 724, 726 (7th Cir.1994) (citing *Equitable Life Ass. Soc. v. Bell*, 27 F.3d 1274, 1277 (7th Cir.1994)).

### A. Equitable's Appeal

#### 1. Rescission of Smith's Policy

Equitable contends that the district court should have rescinded Smith's policy before reaching the question of his disability because he misrepresented his medical history.

The Illinois Insurance Code provides that a misrepresentation in an application for insurance may "defeat or avoid the policy [if] it

---

**2.** Smith is a citizen of Illinois, Equitable is a New York corporation with its principal place of business in New York, and the amount in controversy exceeds $50,000.

shall have been made with actual intent to deceive or materially affects either the acceptance of the risk or the hazard assumed by the company." 215 ILCS 5/154. "Incomplete answers or a failure to disclose material information on an application for insurance may constitute a misrepresentation when the omission prevents the insurer from adequately assessing the risk involved." *Methodist Med. Center of Ill. v. American Med. Sec.*, 38 F.3d 316, 320 (7th Cir.1994) (citing *Garde v. Country Life Ins. Co.*, 147 Ill.App.3d 1023, 101 Ill.Dec. 120, 126, 498 N.E.2d 302, 308 (1986)).

■ Equitable argues that applying the facts to the Illinois standard of material misrepresentation is a mixed question of fact and law requiring de novo review. However, as we have recently stated:

> This court, consistent with decisions by the Supreme Court, *McDermott Int'l Inc. v. Wilander*, 498 U.S. 337, 356, 111 S.Ct. 807, 818, 112 L.Ed.2d 866 (1991); *Cooter & Gell v. Hartmarx Corp.*, 496 U.S. 384, 401–05, 110 S.Ct. 2447, 2458–61, 110 L.Ed.2d 359 (1990); *Pierce v. Underwood*, 487 U.S. 552, 559–61, 108 S.Ct. 2541, 2547–48, 101 L.Ed.2d 490 (1988), has moved decisively to the position that appellate review of determinations of mixed questions of fact and law should be governed by the standard of clear error, and not by the de novo standard. E.g., *G.J. Leasing Co. v. Union Electric Co.*, 54 F.3d 379, 381 (7th Cir. 1995); *Stevens v. United States*, 49 F.3d 331, 334 (7th Cir.1995); *Williams v. Commissioner*, 1 F.3d 502, 505 (7th Cir.1993); *United States v. Spears*, 965 F.2d 262, 269–71 (7th Cir.1992); *Mars Steel Corp. v. Continental Bank N.A.*, 880 F.2d 928, 933 (7th Cir.1989) (en banc). The reasons are several. The trial judge, because he is closer to the facts—the court of appeals gets them at second hand—knows more about the premise to which the legal standard ... is to be applied. He is also more practiced than appellate judges in assessing the significance of facts. And since the legal standard is a given, and only its application to a particular and perhaps unique set of facts is in question, de novo review is not necessary to produce a rea-

sonable uniformity of the legal principles applied within the court's jurisdiction.

■ *United States v. Baldwin*, 60 F.3d 363, 365 (7th Cir.1995). In Smith's case, the district court did not commit clear error in finding that Smith had not materially misrepresented the state of his medical history. Smith informed Equitable of each doctor he had seen and the reason for the visit. Further, Equitable contacted one of the doctors, Dr. Levy, inquired as to Smith's medical condition, and then altered the terms of Smith's policy based upon the resulting information. *Cf. Methodist*, 38 F.3d at 320 (material misrepresentation where applicant with diagnosed heart condition falsely represented that she had never been treated or diagnosed for a heart disorder).

### 2. Total Disability

■ Equitable asserts that Smith was not totally disabled within the meaning of his policy. This is a finding of fact which will be reviewed for clear error. Fed.R.Civ.P. 52(a). "A finding is clearly erroneous when although there is evidence to support it, the reviewing court on the entire evidence is left with the definite and firm conviction that a mistake has been committed." *Anderson v. Bessemer City*, 470 U.S. 564, 573, 105 S.Ct. 1504, 1511, 84 L.Ed.2d 518 (1985). Even greater deference is due when the trial court's findings are based upon the credibility of witnesses. *Id.*

■ "Disability provisions generally fall within one of two classifications, and the difference between them is substantial. An 'occupational' disability policy provides benefits if the claimant is unable to perform his regular job; a 'general' disability provision provides benefits if the claimant is unable to perform any job for which he is qualified by reason of education, training, or experience." *Hammond v. Fidelity & Guaranty Life Ins. Co.*, 965 F.2d 428, 430 (7th Cir.1992) (citations omitted).

Smith's policy provided for a monthly income in the event of total disability, which was defined as follows: "TOTAL DISABILITY means your inability due to injury or sickness to engage in the *substantial and*

*material duties of your regular occupation."* (R. 5 at 8; Pltf. Ex. 1) (emphasis added). The policy included a description of Smith's occupation: President/CEO of a closely held corporation whose duties involved dealing in the purchase of computer hardware for resale. (R. 5 at 4; Pltf. Ex. 1). Thus, Smith's policy was "occupational," providing coverage in the event he could no longer perform his regular occupation.

■ We hold that there was ample evidence to support the district court's finding that Smith was unable to engage in the substantial and material duties of a corporate executive. Smith testified that he was occasionally housebound during his period of disability, he refused to travel, and was fearful of social situations or public speaking. This testimony was corroborated by those that knew Smith during that period: Smith's girlfriend, a social acquaintance, and an instructor at the Coast Guard Auxiliary. Further, Dr. Calamari testified that Smith's condition rendered him totally disabled. Dr. Higgins, Smith's treating physician, agreed with this diagnosis.[3]

Equitable asks us to discount the evidence of Drs. Higgins and Calamari because Higgins is an internist and Calamari did not personally treat Smith. Further, Equitable urges us to accept the evidence of Equitable's experts, Drs. Berc and Ganellan. However, "it is not the function of this court to reweigh the evidence or to substitute its judgment for that of the trier of fact." *Dugan v. United States*, 18 F.3d 460, 463 (7th Cir.1994). The district court made no clear error in finding that Smith was disabled from performing the duties of his occupation.

Equitable also argues that Smith was not under the regular care and attendance of a doctor, as required in the definition of totally disabled, and so was not totally disabled. We disagree. The trial court found that Smith was under the care of Dr. Berent in

1987, Dr. Higgins throughout the time in question, as well as a patient at Dr. Calamari's anxiety disorders clinic in 1991 and 1992. There was no clear error in this finding.

### 3. Satisfaction of Policy Conditions

■ Equitable contends that Smith must submit monthly statements attesting to his continuing disability as a condition precedent to receiving income under the insurance policy. Smith filed such statements until January 1992. The policy reads:

> If the policy provides for periodic payment for a continuing loss, written proof of loss satisfactory to us must be given within 90 days of the end of each monthly period for which we are liable.

(R. 5 at 9; App. at 24). Equitable made payments through October 1991, and then refused to make further payments, concluding that Smith was not totally disabled; Smith filed disability statements through January 1992. It seems incongruous to us for Equitable to require ongoing reports of disability when it has decided that the policyholder is not disabled.

"Illinois courts apply the rule that any ambiguities in the provisions of an insurance policy will be construed against the drafter of the instrument, the insurer, and in favor of the insured." *Heller v. Equitable Life Assur. Soc. of U.S.*, 833 F.2d 1253, 1256 (7th Cir.1987). Further, "provisions that limit or exclude coverage are to be construed liberally in favor of the insured and most strongly against the insurer." *National Union Fire Ins. Co. v. Glenview Park Dist.*, 158 Ill.2d 116, 124, 198 Ill.Dec. 428, 431, 632 N.E.2d 1039, 1042 (1994) (citation omitted).

Smith's policy requires written statements for "each monthly period for which we (Equitable) are liable." However, Equitable had decided that it was not liable from October

---

**3.** Equitable argues that the district court should not have allowed Dr. Higgins' deposition into evidence. We disagree; Equitable has made no showing that the district court abused its discretion in this matter. *See* Fed.R.Civ.P. 32(a)(3)(D); *Rascon v. Hardiman*, 803 F.2d 269, 277 (7th Cir.1986) ("As long as the deposition testimony meets the requirements of the Federal Rules of

Evidence, admission of deposition testimony is within the sound discretion of the trial court."). However, even without Dr. Higgins' deposition, the evidence of Smith's total disability was apparent from the testimony of Dr. Calamari, Smith himself, and the observations of the lay-witnesses who were acquainted with Smith at the time in question.

1991. Construing the provision in Smith's favor as Illinois law directs that we must, the policy cannot be fairly read to require Smith to continue filing statements of his medical condition when Equitable has challenged his initial claim of disability and refused to make payment resulting in the filing of this litigation.

## 4. Statutory Penalty

■ Equitable challenges the district court's decision to assess attorney's fees and a statutory penalty, arguing that a bona fide dispute existed at the time Smith filed for benefits as to whether Smith was totally disabled. Illinois law provides that a court may assess attorney's fees and a penalty against an insurance company for an unreasonable or vexatious delay. 215 ILCS 5/155 (1995).[4]

■ A finding of vexatious or unreasonable delay must be based on the totality of the circumstances, and such a finding "will not be disturbed unless an abuse of discretion is demonstrated on the record." *Rosenburg v. Lincoln Am. Life Ins. Co.*, 883 F.2d 1328, 1335 (7th Cir.1989) (quoting *Fassola v. Montgomery Ward Ins. Co.*, 104 Ill.App.3d 825, 60 Ill.Dec. 581, 586, 433 N.E.2d 378, 383 (1982)). Equitable has not demonstrated such an abuse of discretion.

■ Reviewing the circumstances of the case, the district court stated that the "insurance company took a pretty hard-nosed stand without actually getting the input of an MD," (Tr. at 549), and found that Equitable's delay in payment was unreasonable. This conclusion finds support in the record.

Smith's attending physicians submitted that he was totally disabled, but Equitable refused payment on the basis of the recommendation of one of their own experts who had never examined Smith and was unfamil-

iar with his insurance policy. Although knowledge of an insurance policy is not generally applicable to a medical opinion, it is relevant in Smith's case because Dr. Berc determined that Smith was not totally disabled, without being aware that the policy definition of "total disability" referred specifically to Smith's occupation, and not to a general state of total disability. Further, Equitable did not conduct a medical examination of Smith until two-and-one-half years after Smith had applied for benefits, two years after Equitable had refused benefits, and eight months after Smith had filed suit. We agree with the judgment and decision of the district court and find no abuse of discretion in the trial court's finding that Equitable's delay in making payment was unreasonable.

## B. Smith's Cross–Appeal

■ Smith appeals the district court's denial of pre-judgment interest, claiming that the denial was an abuse of discretion under the law of Illinois. We agree.

As discussed above, the district court found that Equitable's delay was unreasonable and warranted penalty under 215 ILCS 5/155. Illinois law further provides that pre-judgment interest shall be awarded on "money withheld by an unreasonable and vexatious delay of payment." 815 ILCS 205/2. This statute applies to delays in the payment of insurance benefits. *Boyd v. United Farm Mutual Reins. Co.*, 231 Ill.App.3d 992, 173 Ill.Dec. 465, 470–71, 596 N.E.2d 1344, 1349–50 (1992).

Because the district court found unreasonable and vexatious delay, Illinois law directs the award of pre-judgment interest on the amount withheld. The district court's denial of such an award is thus an abuse of discretion.

---

4. The statute provides:
In any action by or against a company wherein there is in issue the liability of a company on a policy or policies of insurance or the amount of the loss payable thereunder, or for an unreasonable delay in settling a claim, and it appears to the court that such action or delay is vexatious and unreasonable, the court may allow as part of the taxable costs in the action

reasonable attorney's fees, other costs, plus an amount not to exceed any one of the following amounts:
(a) 25% of the amount which the court or jury finds such party is entitled to recover against the company, exclusive of all costs;
(b) $25,000;
. . . .
215 ILCS 5/155 (1995).

### III. Conclusion

The judgment of the district court is affirmed in part and reversed in part.