In the

# United States Court of Appeals
## For the Seventh Circuit

———————

Nos. 05-2038 & 05-2416

MEDICAL PROTECTIVE COMPANY,

*Plaintiff-Appellant,*

v.

HYUN KIM, TERRY JENNINGS, EARL H. JENNINGS,
and ILLINOIS INSURANCE GUARANTY FUND,

*Defendants-Appellees.*

———————

Appeals from the United States District Court
for the Southern District of Illinois.
No. 02 C 4121—**G. Patrick Murphy**, *Judge.*

———————

ARGUED NOVEMBER 8, 2006—DECIDED NOVEMBER 13, 2007

———————

Before CUDAHY, KANNE, and SYKES, *Circuit Judges.*

SYKES, *Circuit Judge.* This insurance-coverage dispute involves back-to-back claims-made medical malpractice liability policies issued by two different insurers. A malpractice suit was filed against the insured doctor during the term of the second policy based on an alleged surgical error committed and reported during the term of the first. After the first insurer became insolvent, the second insurer, Medical Protective Company ("MedPro"), brought this action against its insured seeking a declaration that its policy does not cover the risk.

The MedPro policy provides coverage for claims "first filed" within its policy term arising from acts or omissions

that occurred during a retroactive period that includes the date of the surgery at issue in this case. MedPro contended that because the error was reported to the predecessor insurer, the claim was not "first filed" within the term of its policy. In the alternative, MedPro sought rescission or reformation of its policy because the insured doctor did not disclose the surgery when asked about potential claims or suits on his application for insurance. The insured doctor counterclaimed for a declaration of coverage, breach of contract, and also sought statutory penalties for vexatious and unreasonable denial of an insurance claim under Illinois law. *See* 215 ILL. COMP. STAT. 5/155. After a jury found for the doctor on the misrepresentation claim, the district court entered a declaration that MedPro had a duty to defend and indemnify the doctor. The court awarded breach-of-contract damages and statutory penalties under section 5/155.

We affirm the judgment except for the imposition of statutory penalties. We see no reason in this record to disturb the jury's verdict on MedPro's misrepresentation claim. As to coverage, the doctor's receipt of the malpractice complaint, which he promptly sent to MedPro, was the first "filing" of the claim as that term is defined in the policy, and it occurred during MedPro's policy term. That the prior insurer was given notice of the potential for liability does not take this claim outside MedPro's coverages. The district court's award of statutory penalties, however, was improper under section 5/155; an insurer's conduct is not considered vexatious and unreasonable under the statute if there is a bona fide dispute about coverage, as there was here.

## I. Background

On January 9, 2001, Terry Jennings was admitted to Wabash General Hospital in Mt. Carmel, Illinois, after

complaining of severe abdominal pain. The next day Dr. Hyun Kim removed her gallbladder in a procedure known as a laparoscopic cholecystectomy. Before the procedure, Dr. Kim met with Jennings and her husband to discuss complications associated with the surgery, including certain unique risks posed by Jennings's prior surgeries and the presence of preexisting scar tissue.

Jennings was discharged from Wabash Hospital a few days after her procedure but returned within a day or so, again complaining of severe abdominal pain. This readmission, within 15 days of Jennings's initial discharge from the hospital, triggered automatic peer review, a process in which the hospital's medical staff discuss and evaluate the appropriateness of a patient's course of treatment.

During Jennings's second admission, Dr. Kim performed another procedure and discovered that bile was seeping into her abdominal cavity, though he could not pinpoint the source of the leak. To alleviate this problem, he inserted a device to drain the bile from the cavity. This leakage was not the patient's only complication; she also developed aspiration pneumonia after her second procedure. She was discharged about two weeks later, but all was not well.

When Dr. Kim examined Jennings during a follow-up visit at the end of January 2001, he found that her bile leak had not resolved; he referred her to a hospital in Evansville, Indiana, to be examined by a gastroenterologist, Dr. Bello. Further testing revealed a surgical injury—a nick or cut—to Jennings's common bile duct. Dr. Bello told Dr. Kim of his findings, and a decision was made to send Jennings to Indiana University Hospital and Clinics to receive treatment from Dr. Howard, a specialist in hepatobiliary surgery. Dr. Howard agreed with Dr. Bello's assessment that Jennings's injury oc-

curred during the removal of her gallbladder. Dr. Howard provided Dr. Kim with periodic updates of Jennings's condition until she was discharged in the middle of March. At some point after Jennings left the Indiana facility, Dr. Kim discussed with Wabash Hospital's CEO, Jim Farris, whether Jennings should be charged for the services leading to her complications.

Wabash Hospital's Quality and Risk Department also became involved. During Jennings's postoperative care, her husband requested her medical records—a possible sign the Jenningses were contemplating legal action. At this point, Cynthia Delancy, Wabash Hospital's Quality and Risk Manager, thought there were sufficient indicia of risk to notify the hospital's insurer. On April 6, 2001, Delancy submitted a notice of claim form to the hospital's insurer, Phico Insurance Company ("Phico"). The hospital's Phico policy covered the period from July 6, 2000, through July 6, 2001, and provided claims-made liability coverage for the hospital and Dr. Kim as an additional insured. In the notice Delancy indicated that while no claim had yet been filed, Dr. Kim might have injured Jennings during her gallbladder procedure. Delancy also informed Phico of Mr. Jennings's request for his wife's medical records as well as the complications that arose after the second procedure. Notably, Dr. Kim was unaware of both Delancy's submission to Phico and Mr. Jennings's request for his wife's medical records. Phico acknowledged receipt of the notice of claim on April 11, 2001.

On June 19, 2001, Dr. Kim applied for a claims-made policy from MedPro in anticipation of changing his status from an employee of Wabash Hospital to that of an independent provider. Section VI of the MedPro application required disclosure of known loss information; there, Dr. Kim noted a potential claim related to a 1999 laparoscopic cholecystectomy that resulted in a common bile duct injury. In that matter the patient and her family had

expressed dissatisfaction with the complications resulting from her procedure; the patient's attorney also sent Dr. Kim a letter threatening legal action. After listing this 1999 surgery as a possible claim, Dr. Kim checked a box indicating that he had no knowledge of any other claims, potential claims, or suits, "including without limitation, knowledge of any alleged injury arising out of the rendering or failing to render professional services which may give rise to a claim."

A MedPro underwriter, David Hoagland, reviewed and eventually accepted Dr. Kim's application.[1] MedPro issued a policy covering claims made during the policy term of July 6, 2001 to July 6, 2002, with a retroactive date of July 1, 1997.[2] The policy requires MedPro to indemnify and defend:

> A. IN ANY CLAIM FOR DAMAGES, *FIRST FILED DURING THE TERM OF THIS POLICY*, BASED ON PROFESSIONAL SERVICES RENDERED OR WHICH SHOULD HAVE BEEN RENDERED AFTER THE RETROACTIVE DATE, BY THE INSURED OR ANY OTHER PERSON FOR WHOSE ACTS OR OMISSIONS THE INSURED IS LEGALLY RESPONSIBLE, IN THE PRACTICE OF THE INSURED'S PROFESSION AS HEREINAFTER LIMITED AND DEFINED.
>
> IF REPORTED TO THE COMPANY, THE FOLLOWING SHALL BE DEEMED TO BE A CLAIM FILED DURING THE TERM OF THIS POLICY:

---

[1] The exact issuance date of the policy is not contained in the record.

[2] The original listed retroactive date was November 1, 1997, but was later changed to July 1, 1997. Pending approval of his application, Dr. Kim was covered under binders of insurance issued by MedPro. Kim was covered under such a binder when the Jenningses filed suit.

(a) the receipt, by the Insured, of a written notice of legal action for damages as described above, or

(b) the receipt, by the Insured, of a written notification of an intention to hold the Insured responsible for damages as described above, or

(c) the receipt, by the Company during the term of the policy, of written notice of a medical incident from which the Insured reasonably believes allegations of liability may result. In order to be deemed a claim, notice of a medical incident shall include all reasonably obtainable information with respect to the time, place, and circumstances of the professional services from which liability may result and the nature and the extent of the injury, including the names and addresses of the injured and of available witnesses. (Emphasis added.)

The Jenningses filed and served a malpractice suit against Wabash Hospital and Dr. Kim on August 22, 2001. Dr. Kim's office faxed part of the complaint to MedPro the following day. William Meadows, a senior claims specialist in MedPro's legal department, received the fax and spoke by telephone to Dr. Kim. After receiving a copy of the complete complaint and summons, Meadows reviewed Dr. Kim's underwriting file and assigned an attorney, Paul Lynch, to defend him. Phico, believing it was responsible for Dr. Kim's defense as well as the hospital's, likewise assigned counsel. Not wanting to unnecessarily duplicate each other's efforts, the insurers communicated among themselves and resolved that Phico should defend Dr. Kim.

In February 2002 Phico was declared insolvent and placed in liquidation. Dr. Kim then looked to MedPro, which initially accepted his defense but then backpedaled all the way to federal court. MedPro filed this diversity

action against Dr. Kim and the Jenningses seeking a declaration that it had no duty to defend or indemnify; the insurer argued that because Wabash Hospital notified Phico of the possibility of a claim stemming from Terry Jennings's surgery, the claim was not "first filed" during MedPro's policy term and therefore was not covered. Alternatively, MedPro sought rescission or reformation of its policy because Dr. Kim had not disclosed Terry Jennings's surgery as a "potential claim or suit" on his MedPro insurance application.

Dr. Kim counterclaimed against MedPro and the Illinois Insurance Guaranty Fund ("the Guaranty Fund"), alleging MedPro owed primary coverage and had breached its policy by failing to defend. Dr. Kim also sought statutory penalties under Illinois law for vexatious and unreasonable denial of an insurance claim. *See* 215 ILL. COMP. STAT. 5/155. As against the Guaranty Fund, Dr. Kim alleged that it owed him excess coverage. The Guaranty Fund cross-claimed against MedPro, and MedPro eventually agreed to pay the Fund's attorney's fees and costs in the underlying malpractice case if the court determined that MedPro did, in fact, have a duty to defend and indemnify Dr. Kim.

A jury trial was held on MedPro's claim that Dr. Kim misrepresented on his insurance application that he had no knowledge of any potential claims during the retroactive period (other than the 1999 claim not at issue here). Dr. Kim testified that when he was filling out the insurance application, he did not think Jennings's treatment and complications were likely to produce a claim. Dr. Kim explained that the Jenningses had never expressed dissatisfaction with Mrs. Jennings's care, and he had no knowledge of Mr. Jennings's request for his wife's medical records or that Delancy had reported these events to Phico. Dr. Kim contrasted these circumstances with those surrounding the only other potential claim

against him—the 1999 surgery he disclosed on the insurance application. The patient in that surgery had exhibited outright hostility and threatened to sue Dr. Kim. MedPro's underwriter testified he would not have approved Dr. Kim's application if he had been aware of the potential Jennings claim.

After the close of evidence, MedPro moved for judgment as a matter of law pursuant to Rule 50 of the *Federal Rules of Civil Procedure*. In support of its motion, MedPro cited Dr. Kim's testimony about Jennings's injury—specifically his explanation of a mental checklist he uses when determining whether particular treatment might give rise to a claim—as well as Hoagland's testimony that he would not have approved the policy application if Dr. Kim had disclosed a potential claim by the Jenningses. The district court denied MedPro's motion. After closing arguments, the Jenningses moved for judgment as a matter of law based on the evidence that MedPro issued its policy after it was notified of the filing of the Jenningses' lawsuit. Dr. Kim joined in that motion. The court took these motions under advisement pending the jury's verdict.

The jury found Dr. Kim did not knowingly make any misstatement or omission on his MedPro application. MedPro then renewed its motion for judgment as a matter of law on the misrepresentation claim and, in the alternative, asked for a new trial. MedPro also filed a motion for a declaratory judgment that its policy did not cover the Jennings claim. Dr. Kim, in turn, moved for judgment on his counterclaim for a declaration of coverage, breach of contract damages, and statutory penalties.

The district court denied MedPro's motion for judgment as a matter of law or for a new trial on the misrepresentation claim. The court likewise denied MedPro's motion for judgment on its claim for declaratory relief. The

court granted Dr. Kim's motion, declared that Medpro had a duty to defend and indemnify Dr. Kim, and awarded breach of contract damages. The court also granted Dr. Kim's motion for statutory penalties—including costs and attorney's fees—for vexatious or unreasonable denial of an insurance claim under section 5/155. The Guaranty Fund then moved for its costs and attorney's fees in the underlying malpractice suit as well as its costs and fees in the declaratory judgment action. The district court granted the motion. MedPro appealed.

## II.  Discussion

### A.  Medpro's Defense and Indemnity Coverages

MedPro first challenges the district court's denial of its motion for a declaration of noncoverage. Substantively, this motion concerned whether Dr. Kim's claim came within the purview of MedPro's coverages, apart from the issue of any misrepresentation on the insurance application. It is not clear, however, what type of motion this was. MedPro's motion does not invoke any rule of civil procedure, and neither party on appeal has explained how it should be treated. The district court's memorandum order sets forth the standards for motions brought under Rules 50 and 59 of the *Federal Rules of Civil Procedure*, though neither applies. Only the issue of misrepresentation was submitted to the jury; the question of the applicability of MedPro's policy was not. MedPro's motion might be read as inviting the district court to find facts and draw legal conclusions, as though the matter had been tried to the court; MedPro argued that "[r]egardless of whether or not Dr. Kim made a material misrepresentation in his application, the evidence conclusively demonstrates that the Medical Protective Policy . . . does not provide coverage for the Jennings'

claim." The district court's opinion, however, does not comport with the requirements of Rule 52.

At oral argument, the parties agreed that no issue of material fact existed regarding the question of coverage and characterized the issue to be resolved as one of law. We will take the parties at their word. Because there is no issue of fact to be resolved, we treat MedPro's appeal on this issue as if the district court rendered summary judgment, *see* FED. R. CIV. P. 56(c)*; Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986); *Hicks v. Midwest Transit, Inc.*, 479 F.3d 468, 470 (7th Cir. 2007), and apply de novo review, *see Massey v. Johnson*, 457 F.3d 711, 716 (7th Cir. 2006).

MedPro maintains that its duty to defend and indemnify Dr. Kim was not triggered because the Jenningses' lawsuit was not a claim "first filed" under its policy. The resolution of MedPro's argument requires us to interpret and apply the policy language, which the parties agree is controlled by Illinois law. Illinois courts construe the language of an insurance policy according to well-established rules of contract interpretation. *See Valley Forge Ins. Co. v. Swiderski Elecs., Inc.*, 860 N.E.2d 307, 314 (Ill. 2006); *Hobbs v. Hartford Ins. Co. of the Midwest*, 823 N.E.2d 561, 564 (Ill. 2005). That is, the policy should be construed as a whole and every provision given effect. *Valley Forge*, 860 N.E.2d at 314; *Country Mut. Ins. Co. v. Livorsi Marine, Inc.*, 856 N.E.2d 338, 342-43 (Ill. 2006); *Cent. Ill. Light Co. v. Home Ins. Co.*, 821 N.E.2d 206, 213 (Ill. 2004). We will interpret and apply policy language as written, assuming the policy is unambiguous and does not contravene public policy. *Hobbs*, 823 N.E.2d at 564.

Claims-made and occurrence-based insurance policies insure different risks. "In the occurrence policy, the risk is the occurrence itself. In the claims made policy, the risk insured is the claim brought by a third party against

the insured." *Cont'l Cas. Co. v. Coregis Ins. Co.*, 738 N.E.2d 509, 518 (Ill. App. Ct. 2000). "A typical claims-made policy covers acts and omissions occurring either before or during the policy period; for prior acts, the policy may provide full retroactive coverage or it may only cover claims arising out of acts and omissions after the 'retroactive date' specified in the declarations." BARRY R. OSTRAGER & THOMAS R. NEWMAN, HANDBOOK ON INSURANCE COVERAGE DISPUTES (Aspen Publishers 13th ed. 2006), Vol. 1, § 4.02[b], p. 129; *see also* ERIC MILLS HOLMES, HOLMES'S APPLEMAN ON INSURANCE, 2d (Lexis Law Publishing 1998), Vol. 3, Ch. 16, § 16.4, p. 315. Insurers issuing claims-made policies "protect themselves against liability for old occurrences by including a 'retroactive date' specifying the earliest occurrence to be covered, no matter when the claim is made.*" Nat'l Cycle, Inc. v. Savoy Reins. Co., Ltd.,* 938 F.2d 61,62 (7th Cir. 1991). A " 'claims-made and reported' policy requires not only that the claim be first made during the policy period, but also that it be reported to the insurer during the policy period." INSURANCE COVERAGE DISPUTES, Vol. 1, § 4.02[b], p. 130. A very restrictive type of claims-made insurance will require "not only that the claim be both made and reported to the insurer during the policy period, but also that the claim arise out of wrongful acts that take place after the inception of the policy and during the policy period." *Id.*

The claims-made policy MedPro issued to Dr. Kim is a "claims-made and reported" policy retroactive to July 1, 1997. That is, it covers acts or omissions occurring any time after the July 1, 1997 retroactive date for which a claim is "first filed" and reported to the insurer during the term of the policy—July 6, 2001 to July 6, 2002. Terry Jennings's surgery occurred on January 9, 2001, well within the policy's retroactive period; the dispute here is about whether the Jennings claim was "first filed" during the term of the policy. The policy identifies three ways

a claim is "filed" for purposes of MedPro's duty to defend and indemnify. The first is "receipt, by the Insured, of a written notice of legal action for damages." The second is "receipt, by the Insured, of a written notification of an intention to hold the Insured responsible for damages." In either case, the insured must report the receipt of notice to MedPro in order to trigger coverage. The third way a claim is considered "filed" is "receipt by [MedPro] during the term of the policy, of written notice of a medical incident from which the Insured reasonably believes allegations of liability may result."

The first of these possibilities is fully satisfied here: Having never before received written notice of the Jenningses' lawsuit or their intent to hold him responsible for damages, Dr. Kim received a copy of their summons and complaint on August 22, 2001, and reported it to MedPro the next day. Although this occurred within MedPro's policy term, MedPro argues this was not the "first" filing of the Jennings claim. MedPro takes the position that Delancy's April 6, 2001 notice *to Phico* was the "first" filing of the Jennings claim, and argues at length that only Phico's policy covers the claim. This shift in focus is understandable but misplaced.

Whether MedPro has a duty to defend and indemnify is determined by the language of its own policy, not Phico's. Delancy's notice to Phico was not a "filing" of the Jennings claim under any of the three definitions of that term in MedPro's policy. The first two definitions of "filed" involve "receipt, *by the Insured*," of written notice of an action for damages or an intent to seek damages. Wabash Hospital is not MedPro's insured, Dr. Kim is. Whatever the hospital might have known or suspected about the Jenningses' intentions, the first time *Dr. Kim* received written notice of an action for damages or any intention to hold him responsible for damages was August 22, 2001, when he received the Jenningses' summons and com-

plaint, and he timely reported that action to MedPro. The third definition of "filed" is not implicated here.

MedPro argues that this straightforward interpretation of the policy language renders the word "first" in the phrase "first filed" surplusage, and removes any distinction between a claim "filed" during the policy term and a claim "first filed" during the policy term. This argument is unpersuasive. Dr. Kim might have received written notice from the Jenningses of their intent to file a claim against him before his MedPro policy term commenced, and then later received and transmitted the complaint after the term commenced. Under this scenario, Dr. Kim's receipt and reporting of the complaint during the policy term would constitute a "filing," but not a "first filing," because of his prior receipt of written notice of the intent to hold him responsible for damages. The "first filed" language in the policy appears to deny coverage if one of the methods of filing a claim is performed before the policy term commences and another method afterward, even though both pertain to the same matter. We need not exhaust all the possible ways in which a claim may be "filed" without being "first filed." Suffice it to say that our reading of the policy does not necessarily render the word "first" in "first filed" superfluous.

These interpretive arguments aside, the centerpiece of MedPro's argument is the Illinois Appellate Court's decision in *Coregis*. That case involved a dispute between two insurance companies, Continental and Coregis, over which one was responsible for paying the settlement of an insured's claim. Both insurers had issued claims-made policies to the insured, an accounting firm, with Continental's beginning when Coregis's terminated. Coregis's policy provided that if during the policy period the insured "first becomes aware of any potential claim," the insured "must give immediate written notice of such act, error or omission" to the insurer, and that "any claims subse-

quently made" against the insured "arising out of that act, error or omission shall be considered to have been made and reported during the policy period." *Coregis*, 738 N.E.2d at 512. Continental's policy, in turn, excluded coverage for "[a]ny wrongful act which happened prior to the 'effective date' " of the policy, "if on such date [the insured] knew or could reasonably foresee that such wrongful act might be the basis for a claim." *Id.*

The insured accounting firm in *Coregis* became aware of a potential claim and reported it to Coregis the day before its policy expired. Later, during Continental's policy period, the accounting firm was sued for the wrongful act which formed the basis of the potential claim previously reported to Coregis. Continental paid to settle the claim and sued Coregis for contribution. In a lengthy opinion, the Illinois Appellate Court affirmed the trial court's grant of summary judgment for Continental. Because the wrongful act or omission occurred during Coregis's policy period and the insured gave Coregis notice of the potential claim before that period expired, the Court held that Coregis's coverage was triggered and the lawsuit later filed fell within the Coregis policy language. *Id.* at 519-20. Because Continental's policy specifically *excluded* coverage for wrongful acts occurring before its effective date, however, the court held that Coregis's policy alone covered the loss. *Id.* at 522.

We find *Coregis* distinguishable from this case. The Continental policy there, unlike MedPro's here, was a restrictive form of claims-made coverage: it limited coverage to claims made and reported during the policy period arising from acts that also *occurred* during the policy period; wrongful acts occurring before the policy's effective date were specifically excluded, unless the insured did not know or have reason to foresee they might form the basis of a claim. MedPro's policy, in contrast, does *not* exclude coverage for wrongful acts occurring before

the policy period; to the contrary, it provides retroactive coverage for acts or omissions occurring after July 1, 1997, which includes the Jennings claim.

MedPro maintains that *Coregis* stands for the proposition that consecutive claims-made policies cannot cover the same loss. But the *Coregis* court itself discouraged such a broad reading of its holding. *Id.* at 523, n.3 ("nowhere in this court's opinion do we state that two claims made policies can never cover the same loss"). Because Dr. Kim first received written notice of the Jennings claim when he received the summons and complaint on August 22, 2001, and because he timely reported that claim to MedPro, the claim was "first filed" during the policy's term and its coverages apply.

## B. Misrepresentation Claim

MedPro also appeals the district court's denial of its Rule 50 motion for judgment as a matter of law on the issue of misrepresentation. Our review of the district court's ruling is de novo, and we limit ourselves to asking whether any rational jury could have found for Dr. Kim. *See Byrd v. Ill. Dep't of Pub. Health*, 423 F.3d 696, 712 (7th Cir. 2005); *Harvey v. Office of Banks & Real Estate*, 377 F.3d 698, 707 (7th Cir. 2004). We draw all inferences in favor of the nonmoving party, *see Tart v. Ill. Power Co.*, 366 F.3d 461, 472 (7th Cir. 2004), and will affirm the district court's ruling if the jury was presented with sufficient evidence from which it reasonably could have reached its verdict. *See Honaker v. Smith*, 256 F.3d 477, 484 (7th Cir. 2001); *Massey v. Blue Cross-Blue Shield of Ill.*, 226 F.3d 922, 924 (7th Cir. 2000). We do not reweigh the evidence or make credibility determinations. *See Sarkes Tarzian, Inc. v. U.S. Trust Co. of Fla. Sav. Bank*, 397 F.3d 577, 581 (7th Cir. 2005).

MedPro claims Dr. Kim made a material misrepresentation on his policy application when responding to the question: "Do you have knowledge of any claims, potential claims, or suits in which you may become involved, including without limitation, knowledge of any alleged injury arising out of the rendering or failing to render professional services which may give rise to a claim?" Dr. Kim checked the "no" box. MedPro argues this answer was a material misrepresentation because Dr. Kim did not disclose his treatment of Terry Jennings as a potential claim, and it would not have issued the policy had it known of this potential claim.

Under Illinois law, only misrepresentations made with an intent to deceive or that materially affected the insurance company's decision to accept an insured's risks may defeat a duty to defend. *See* 215 ILL. COMP. STAT. ANN. 5/154 (West 2007); *see also TIG Ins. Co. v. Reliable Research Co.*, 334 F.3d 630, 635 (7th Cir. 2003); *Golden Rule Ins. Co. v. Schwartz*, 786 N.E.2d 1010, 1015 (Ill. 2003) ("The statute [215 ILL. COMP. STAT. 5/154] establishes a two-prong test to be used in situations where insurance policies may be voided: the statement must be false and the false statement must have been made with an intent to deceive or must materially affect the acceptance of the risk or hazard assumed by the insurer."). The district court's jury instructions and the jury verdict form, however, do not precisely track the Illinois statute. The court instructed the jury:

> The Medical Protective Company has the burden of proving each of the following propositions: First, that Dr. Kim knowingly made a misstatement or omission on his application for professional liability insurance; and second, that the misstatement or omission was material to the Medical Protective Company's acceptance of the risk; and third, that the policy of professional liability insurance would not have been issued

to Dr. Kim if the Medical Protective Company had been informed of a potential claim by Terr[y] and Earl Jennings.

This instruction likely was intended to reflect the policy application's language, which inquired into Dr. Kim's *knowledge of* potential claims against him. The special verdict form likewise asked whether Dr. Kim "knowingly" made a misstatement or omission on his application for insurance. This adaptation of the instructions and special verdict form is consistent with the Illinois Supreme Court's decision in *Golden Rule*. In that case, the court considered an alleged misrepresentation on an insurance policy application that contained an attestation that the insured's answers were provided to the best of his "knowledge and belief." The court held that this language "shift[ed] the focus" to what the applicant knew and believed to be true in determining whether the application contained a misrepresentation for purposes of the statute. *Golden Rule,* 786 N.E.2d at 1016-17.

Here, the question MedPro claims Dr. Kim answered falsely inquired into his knowledge of injuries that may give rise to claims. Although the instruction and special verdict could have been clearer, the jury's focus was essentially directed to what Dr. Kim *knew*, and this was appropriate under *Golden Rule*. MedPro argues that Dr. Kim's knowledge of Terry Jennings's injury and course of treatment, including her stay in Evansville, suggests that Dr. Kim knew a lawsuit was highly likely. MedPro also points to Dr. Kim's participation in a peer review session triggered by Jennings's second admission to Wabash Hospital and Dr. Kim's meeting with the hospital's CEO to discuss whether Jennings should be billed—events which, according to MedPro, demonstrate that Dr. Kim knew a lawsuit was in the offing.

But the jury also heard testimony that laparoscopic cholecystectomies entail known surgical risks, Dr. Kim

informed the Jenningses of these risks, and the Jenningses never voiced dissatisfaction to Dr. Kim. In addition, at the time he completed the MedPro application, Dr. Kim did not know Mr. Jennings had requested his wife's medical records or that Delancy had filed a notice of potential claim with Phico. MedPro's underwriter, Hoagland, and a MedPro attorney, Meadows, also testified that they had no reason to think Dr. Kim knew of a potential claim by the Jenningses prior to their filing suit. Finally, it was undisputed that the MedPro policy was issued after Dr. Kim notified the insurer about the Jenningses' lawsuit. The jury was entitled to sift and weigh this evidence; the evidence was sufficient to support its verdict in Dr. Kim's favor.

## C.  Statutory Fees and Costs under Section 5/155

MedPro's final issue on appeal is a challenge to the district court's imposition of statutory penalties in the form of attorney's fees and costs. We review the district court's award for abuse of discretion. *See Citizens First Nat'l Bank of Princeton v. Cincinnati Ins. Co.*, 200 F.3d 1102, 1109 (7th Cir. 2000).

The Illinois insurance code allows courts to award costs and attorney's fees to an insured when an insurer's action is deemed "vexatious and unreasonable." 215 ILL. COMP. STAT. ANN. 5/155 (West 1997). Whether an insurer acted unreasonably or vexatiously presents an issue of fact, *see Boyd v. United Farm Mut. Reins. Co.*, 596 N.E.2d 1344, 1349 (Ill. App. Ct. 1992); *Bernstein v. Genesis Ins. Co.*, 90 F. Supp. 2d 932, 940 (N.D. Ill. 2000), requiring courts to consider the totality of circumstances, *see Smith v. Equitable Life Assurance Soc'y of U.S.*, 67 F.3d 611, 618 (7th Cir. 1995); *Knoll Pharm. Co. v. Auto. Ins. Co. of Hartford*, 210 F. Supp. 2d 1017, 1028 (N.D. Ill. 2002); *Fassola v. Montgomery Ward Ins. Co.*, 433 N.E.2d 378, 383 (Ill. App. Ct. 1982). If there is a bona fide dispute regarding cover-

age—meaning a dispute that is "[r]eal, genuine, and not feigned," *see McGee v. State Farm Fire & Cas. Co.*, 734 N.E.2d 144, 153 (Ill. App. Ct. 2000) (citing BLACK'S LAW DICTIONARY 177 (6th ed. 1990))—statutory sanctions are inappropriate, *see State Farm Mut. Auto. Ins. Co. v. Smith*, 757 N.E.2d 881, 887 (Ill. 2000).

The district court's ruling on the issue of statutory penalties is conclusory; the court did not address whether MedPro's arguments against coverage raised a bona fide dispute—i.e., one that is real, genuine, and not feigned—notwithstanding that the arguments failed. Although MedPro has not convinced us to reverse the judgment on the merits, we cannot agree that MedPro's conduct was vexatious or unreasonable. Its arguments were "presented with reasoned support," *Citizens First Nat'l Bank,* 200 F.3d at 1110, and the coverage question was a difficult one; although MedPro was unsuccessful, this was a bona fide dispute regarding coverage, and that is all Illinois law requires to avoid the imposition of section 5/155 penalties. The district court abused its discretion by awarding statutory penalties, and that aspect of the judgment must be vacated.

The district court also awarded the Guaranty Fund's attorney's fees and costs in the underlying Jennings litigation, which is not challenged on appeal as it was the product of the parties' pretrial agreement. But the district court went further and granted the Fund's motion for its attorney's fees incurred in defending the declaratory judgment action. Neither the Fund nor the district court expressly identified the authority for this award, although it appears to be based on the court's finding that MedPro's conduct was vexatious and unreasonable. It is unclear whether the Fund, as a noninsured, is entitled to make a claim under section 5/155. But because section 5/155 penalties were unwarranted here,

the order granting the Fund's motion for attorney's fees in the present action must also be vacated.

For the foregoing reasons, the judgment of the district court is AFFIRMED, with the exception of the award of costs and attorney's fees under section 5/155; we VACATE that aspect of the judgment and remand for entry of an amended judgment consistent with this opinion.

A true Copy:

      Teste:

_____

*Clerk of the United States Court of
Appeals for the Seventh Circuit*